# SUPREME COURT OF TENNESSEE

#### FOR THE

## MIDDLE DIVISION

---

### NASHVILLE, DECEMBER TERM, 1923.

---

### (Continued from Vol. 149.)

---

### L. G. HAWKINS *v.* W. A. BYRN *et al.**

### (*Nashville.* December Term, 1923.)

1. **PRINCIPAL AND AGENT.** Dismissing bill held proper in view of verdict.

   In suit for balance due on note, where jury found that maker's agent, for a consideration to the agent moving from payees, induced the maker to sign the note, dismissing bill was proper. (*Post, p. 9.*).

2. **PRINCIPAL AND AGENT.** Secret contract to pay agent consideration for bringing about contract with principal voidable at principal's option.

   Where agent is secretly paid consideration by third persons to bring about contract with his principal, when they knew he was acting for another, such contract is voidable at election of principal. (*Post, pp, 9, 10.*)

   150 Tenn.—1.

(1)

3. **PRINCIPAL AND AGENT.** Evidence sustained finding of complainant's agreement to pay defendant's agent consideration to act for them without defendant's knowledge.

Evidence *held* to sustain finding that sellers of oil-drilling machine paid consideration to buyer's agent to act for them in transaction without knowledge of buyer. (*Post, pp.* 9, 10.)

4. **APPEAL AND ERROR.** Verdict on conflicting evidence, approved by trial court, not disturbed.

Verdict on conflicting evidence approved by trial court cannot be disturbed on appeal. (*Post, p.* 10.)

5. **PRINCIPAL AND AGENT.** If agent without principal's consent represents adverse party, contract voidable at principal's option.

If agent, without knowledge and consent of principal, represents adverse party in transaction, contract so procured is voidable at principal's option. (*Post, p.* 10.)

Case cited and distinguished:   Siler v. Perkins, 126 Tenn., 380.

6. **PRINCIPAL AND AGENT.** Principal may avoid contract by agent representing adverse party without showing damages.

Where agent of buyer of oil-drilling machinery represented seller without buyer's knowledge, it was not necessary that buyer should show damages in order to avoid contract so obtained. (*Post, pp.* 10, 11.)

Case cited and approved:   Robeson & Weaver v. Ramsey' 147 Tenn., 25.

Case cited and distinguished:   Tisdale v. Tisdale, 34 Tenn., 596.

7. **PRINCIPAL AND AGENT.** Principal authorized to repudiate note procured by unlawful deal with agent.

Where note given for oil-drilling machinery was obtained by unlawful deal with maker's agent who acted for sellers for consideration moving from them, without it being disclosed to maker, maker could repudiate liability. (*Post, p.* 11.)

8. **JUDGMENT.** Court unauthorized to rescind contract between oil company and defendants for drilling oil well.

Hawkins v. Byrn.

Where contract between defendants and oil company for drilling oil well was separate from contract between defendants and agent of company for purchase of drilling outfit, in action on note given, for drilling outfit, where oil company was not a party, it was beyond court's jurisdiction to direct rescission of contract for drilling well. (*Post, pp.* 11, 12.)

9. **SALES.** Rescission of contract for sale of well-drilling equipment not authorized.

Where buyer of oil well drilling outfit, when sued on note given for purchase price, did not tender or offer to return property purchased, decree for rescission of contract was not authorized. (*Post, pp.* 12-14.)

Cases cited and approved: A. Landreth Co. v. Schevenal, 102 Tenn., 486; Hill v. Harriman, 95 Tenn., 300; Southern Brass & Iron Co. v. Exeter Machine Works, 109 Tenn., 67; Curtis v. Brannon, 98 Tenn., 153; Taylor v. Swafford, 122 Tenn., 303; Coffee v. Ruffin, 44 Tenn., 487; Bogle v. Hammons, 49 Tenn., 136.

10. **EVIDENCE.** Not presumed that oil-drilling equipment remained in same condition.

Presumption cannot be indulged that oil-drilling outfit having been left on the lease is still there and in as good condition as when abandoned. (*Post, p.* 14.)

*Headnote 1. Agency, 2 C. J. section 521; 2. Agency, 2 C. J., section 521; 3. Agency, 2 C. J., section 726; 4. Appeal & Error, 4 C. J., section 2841; 5. Agency, 2 C. J., section 520; 6. Agency 2 C. J., section 520; 7. Agency, 2 C. J., section 521; 8. Judgments, 33 C. J., section 61; 9. Sales, 35 Cyc, p. 146; 10. Evidence, 22 C. J., section 28.

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County.— Hon. Jno. R. Aust, Chancellor.

Walter Stokes, for appellant.

W. E. Norvell, Jr., and Morton Adams, for appellees.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The Wilbarger County Oil Company, a Texas corporation, owned leases on about 2,500 acres of land in Texas. It had started the digging of a well on this property and had gotten down about 600 feet. The gentlemen who held the stock of the Wilbarger County Oil Company owned, as individuals, oil leases on about 2,100 acres of land which adjoined the property of the oil company. The same gentlemen as individuals owned a well-drilling outfit with which they had started the well on the oil company's property just mentioned.

In February, 1920, G. Bibb Jacobs and W. A. Byrn went to Texas in the interest of the Wichita-Homer Oil & Refining Company, a Tennessee concern, owned by parties in Nashville. Jacobs preceded Byrn to Texas, and at Vernon, Tex., where the stockholders of the Wilbarger County Oil Company lived, Jacobs came into contact with the complainant, L. G. Hawkins, and associates who owned the stock of the oil company, and who owned as individuals the leases on the land adjoining that of the oil company and the well-drilling outfit.

Jacobs had some negotiations with these Texas parties, and later Byrn came to Vernon, Tex., and Jacobs and Byrn had a conference with Hawkins and associates and framed up a deal. Byrn remained in Vernon only a few hours and left Jacobs there. The understanding was that Jacobs was to look after the preparation of written contracts and perhaps some other details.

After Byrn left Vernon, Jacobs and the local attorney for the Texas people, who was also interested in the properties, drew up certain documents in writing. One of

these papers was a contract by which the Wilbarger County Oil Company agreed to issue and deliver to Byrn and Jacobs 1,300 shares of the capital stock of said corporation, in consideration of Byrn and Jacobs undertaking to drill a well on the property of the oil company to the depth of 2,500 feet, unless oil or gas was found at a less depth. A second paper was a note for $17,500, which sum Byrn and Jacobs were to pay for the well-drilling outfit belonging to Hawkins and associates located on the oil company's land. In addition to these papers assignments were executed by Hawkins and associates whereby they transferred to Jacobs individually, and to his wife a one-half interest in the oil leases owned by Hawkins and associates on 2,100 acres of land adjoining the oil company's land.

Byrn went to Wichita from Vernon before these various contracts were prepared. The note for $17,500 to be given for the well-drilling equipment, and the contract, whereby Byrn and Jacobs undertook to drill the well in exchange for the stock in the oil company, were presented to Byrn for his signature at Wichita a few days later. After a slight change was made in the contract with the corporation, Byrn signed it, and also signed the note. Jacobs had previously signed both documents.

The stock in the Wilbarger County Oil Company (or most of it) was turned over to Byrn's attorney in Wichita, and Byrn and Jacobs took charge of the well-drilling machinery, made a contract with a man named Matthews to continue the drilling of the well, and Matthews began operations. Subsequently Byrn paid $7,500 on the $17,500 note; the Wichita-Homer Company furnishing the money.

The original bill herein was filed against Byrn and Jacobs to recover $10,000, the balance due on the $17,500

note with interest and attorney's fee. Jacobs could not be found, and the bill was dismissed as to him. Byrn answered, denying liability for the balance of the note, and seeking a rescission of the contracts referred to and a recovery of the $7,500 paid. The $17,500 note was made payable to L. G. Hawkins, who seemed to have acted as a trustee for his associates. The bill was filed by Hawkins alone, and no other parties were brought in by the cross-bill.

It was alleged in the cross-bill that Byrn and Jacobs acted in this matter as agents for the Wichita-Homer Oil & Refining Company, that this fact was known to the complainant and his associates, and that the contracts were made in the name of Byrn and Jacobs, for the reason that the Wichita-Homer Oil & Refining Company was not properly qualified to do business in Texas. The cross-bill averred that the contracts made between Byrn and Jacobs on the one hand and the Wilbarger County Oil Company and Hawkins and associates on the other, so far as Byrn was informed, contemplated merely a transfer of 1,300 shares of the oil company's stock, in consideration of the undertaking of Byrn and Jacobs to dig the well, and a transfer of the well-digging outfit, in consideration of the note of Byrn and Jacobs for $17,500. Cross-complainant alleged, however, that he later learned that Hawkins and his associates had a secret arrangement with Jacobs whereby they were to convey and did convey to Jacobs individually a one-half interest in their oil leases of the 2,100 acres of land adjoining the oil company's property, in consideration of Jacobs' inducing Byrn to enter into the contracts heretofore outlined. It was charged that Jacobs was the agent of Byrn and of the Wichita-Homer Oil &

Refining Company, and was known so to be by Hawkins and associates, and that this private deal between Jacobs and Hawkins and associates was a fraud upon Byrn and the Wichita-Homer Oil & Refining Company, and entitled Byrn to avoid the aforesaid contracts.

Hawkins answered the cross-bill and denied any secret arrangement with Jacobs. He said that it was fully understood by Byrn that Byrn and Jacobs were to get, not only the stock in the oil company, but were to get a one-half interest in the oil leases on the adjacent land. That before Byrn left Vernon he told Hawkins and associates that Jacobs would attend to the preparation of the written contracts, and told them to have the papers prepared according to Jacobs' instructions. Hawkins denied that he or his associates ever heard of the Wichita-Homer Oil & Refining Company and said that he and his associates supposed that Byrn and Jacobs were acting for themselves. He insisted that he and his associates had acted in the utmost good faith, that Byrn knew that the one-half interest in the adjacent oil leases was part of the consideration of the deal, and that the transfer of these leases was made to Jacobs individually in perfect good faith, and because Byrn had left word that the papers were to be drawn according to Jacobs' instructions.

A trial by jury was demanded by the defendant, and issues were prepared and submitted to the jury by the chancellor. Several depositions were introduced, and oral testimony was also heard by the jury. The following issues were submitted to the jury:

"(1) At the time of the transaction out of which this suit arises, was G. Bibb Jacobs, the agent of the Wichita-Homer Oil Company, authorized by it to acquire or assist

in acquiring leases, drilling equipment, and contract or assist in contracting for digging wells?

"(2)　Did the complainant Hawkins and his associates know that the transaction made by Byrn and Jacobs in their own name was made by them as agents of, and for and in behalf of, the Wichita-Homer Oil Company?

"(3)　Did G. Bibb Jacobs act in behalf of said Hawkins and his associates or the company represented by them in this transaction, for a consideration moving from them or either of them, without the same being disclosed to or known by the defendant W. A. Byrn?"

The jury answered all these issues "Yes."

The Wichita-Homer Oil & Refining Company filed a petition asking that it be made a party to the case, and that it be permitted to adopt the answer and cross-bill of Byrn. This petition was allowed by the chancellor, and it was ordered by him that, inasmuch as no new issues were raised by the intervener, the answer of Hawkins to the cross-bill of Byrn should stand as an answer to the claims of the Wichita-Homer Oil & Refining Company.

The chancellor thereupon decreed that the original bill be dismissed, that the contracts be rescinded, and that the Wichita-Homer Oil & Refining Company recover of Hawkins and associates the $7,500 paid them on the note. He also directed that the stock in the Wilbarger County Oil Company and the well-drilling outfit be restored to the former owners.

There were some other proceedings which we need not notice, and, complainant's motion for a new trial having been overruled, he appealed in error to this court.

Several errors are assigned which it will not be necessary to discuss in detail. What we say will cover the questions raised by all the assignments.

The action of the chancellor in permitting the Wichita-Homer Oil & Refining Company to become a party, which action is criticized, is not material in the view which we take of the case.

In dismissing the original bill, we think the chancellor was right, and that he could not have done otherwise, in view of the jury's verdict.

We do not regard the first two issues as important. Whether Jacobs acted for the Wichita-Homer Oil & Refining Company or whether he acted for Byrn and Jacobs is not a matter of any consequence.

No matter whose agent Jacobs was, if Hawkins and his associates secretly paid Jacobs a consideration to bring about the execution of the contracts, when they knew he was acting for another person, then such contracts are voidable at the election of Jacobs' principal, whoever that principal may be. Responding to the third issue, the jury found that Hawkins and his associates did pay a consideration to Jacobs to act for them in this transaction without the knowledge of Byrn. It is not denied that Hawkins and associates knew that Jacobs was representing Byrn.

We think there is material evidence to sustain this finding of the jury. Byrn testifies that he knew nothing of the assignment of the interest in the adjacent leaseholds to Jacobs and his wife, that such a consideration did not enter into the discussion that he had with Hawkins and associates, and that he supposed all that he and Jacobs were getting was the stock in the Wilbarger County Oil

Company and the well-drilling outfit. The testimony of Byrn as to his knowledge and intentions is confirmed in certain details by that of Ragsdale. Jacobs was on the ground first, had repeated conferences with Hawkins and associates, and there is no satisfactory explantion upon the record as to why the assignments of the adjacent lease-holds were made to Jacobs individually and to his wife, when the other property was transferred to Byrn and Jacobs.

True, Hawkins and several of his associates testify that Byrn understood the whole matter, and that the assignments were made to Jacobs individually in pursuance of authority given by Byrn, but this merely makes a conflict in the evidence. The verdict of the jury was approved by the trial court, and we cannot disturb this finding.

If an agent without the knowledge and consent of his principal represents the adverse party in a transaction, a contract so procured is voidable at the option of the principal.

"The payment of a bribe, secret commission, or gratuity to the agent by a third party as an inducement for entering into contractual relations on behalf of his principal, or an agreement to pay such commission, will entitle the principal to avoid the contract. Cyc. vol. 31, pp. 1572, 1573." *Siler* v. *Perkins,* 126 Tenn., 380, 391, 149 S. W., 1060, 1063 (47 L. R. A. [N. S.] 232).

It is not necessary that Byrn should show damages in order to avoid a contract so obtained.

"It is one of the canons of a court of equity, that one who undertakes to act for others cannot . . . act for himself. . . . Hence the fairness or unfairness of the transaction, and the comparison of price and value, or the existence or absence of actual fraud, are not permitted to

enter into the consideration of the court. It is enough that the relation of trustee, and *cestui que trust* existed. This appearing, the investigation is at an end, and the doctrine applies with all its force." *Tisdale* v. *Tisdale,* 34 Tenn., (2 Sneed) 596, 64 Am. Dec. 775.

See *Robeson & Weaver* v. *Ramsey,* 147 Tenn., 25, 245 S W., 413; 13 C. J., 415; Clark & Skyles on Agency, section 405.

The note sued on having been obtained, in so far as Byrn is concerned, in consequence of this unlawful dealing with Byrn's agent, the chancellor properly held that Byrn was entitled to repudiate further liability upon said instrument.

As to the rescission granted, however, we are not able to follow the decree of the chancellor.

While there was one general transaction, nevertheless there were two contracts entered into by Byrn and Jacobs on the one hand, and Hawkins and his associates, and the Wilbarger County Oil Company, on the other. Under one contract Hawkins and associates sold to Byrn and Jacobs the well-drilling outfit for $17,500. Under the other contract the Wilbarger County Oil Company sold to Byrn and Jacobs 1,300 shares of the stock of that corporation in consideration of Byrn and Jacobs undertaking to drill à well on the company's property. These are separate contracts. They are independent. The parties are not the same. Either contract might be performed without reference to the other. Or one might be rescinded without touching the other.

The Wilbarger County Oil Company is not a party to this suit. The court has no jurisdiction of that concern. It is therefore, beyond our power to direct a rescission of the

contract entered into between the Wilbarger County Oil Company and Byrn and Jacobs, whereby the latter agreed to dig the well in consideration of the shares of stock in the former.

Nor in our opinion does the record present a case to justify a decree for rescission of the contract between Hawkins and associates and Byrn and Jacobs for the sale of the well-drilling equipment.

It is said in several of our cases that a bill for rescission must aver the repayment or tender of the consideration received on the fraudulent agreement by the complainant. *A. Landreth Co.* v. *Schevenel,* 102 Tenn., 486, 52 S. W., 148; *Hill* v. *Harriman,* 95 Tenn., 300, 32 S. W., 202; *Southern Brass & Iron Co.* v. *Exeter Machine Works,* 109 Tenn., 67, 70 S. W., 614. It is insisted by the appellant that the cross-bill here contains no sufficient averments of this nature.

On the other hand it is said that there is a distinction between rescission at law and rescission in equity. That in equity the return or offer to return the consideration of a contract sought to be vacated for fraud is not a condition precedent to the institution of such a suit. This for the reason that a court of equity has power to adjust the rights of the parties, and to impose by decree such terms on the complainant as may be equitable. Black on Rescission and Cancellation, section 672; Williston on Contracts, section 1529.

While perhaps a return or a tender of the consideration need not be averred in a suit for rescission in equity, yet, under the authorities just above cited, as a condition to the relief sought, a court of equity will decree the restoration of such consideration. See, also, *Curtis* v. *Brannon,*

98 Tenn., 153, 38 S. W., 1073, 69 L. R. A., 760.   This is true save in exceptional cases, as where the property is of no value, or where the circumstances are otherwise unusual.   *Taylor* v. *Swafford,* 122 Tenn., 303, 123 S. W., 350, 25 L. R. A., (N. S.) 442; *Coffee* v. *Ruffin,* 44 Tenn., (4 Cold.) 487; *Bogle* v. *Hammons,* 49 Tenn., (2 Heisk.) 136: 9 C. J. 1210 et seq.

In the case before us we could not decree a recovery in favor of Byrn or of the Wichita-Homer Oil & Refining Company for the $7,500.00 paid to Hawkins and associates, unless we could at the same time restore the well-drilling outfit to the latter.   Byrn and Jacobs took possession of this property.   It was admittedly of considerable value.   Matthews, the employee of Byrn and Jacobs, used the equipment for some time.   No witness undertakes to say where the property now is or what has become of it.   Byrn says he left it on the ground; that is to say, he abandoned it.

It appears from the testimony of Byrn and Ragsdale that Matthews, the man employed to drill the well, absconded, owing local banks, after digging about 400 feet. Under his contract he was not to be paid until he had sunk the well 500 feet, and he left before any money was due him from Jacobs and Byrn.   There is a suggestion on the record that the outfit was seized for the satisfaction of laborers' or mechanics' liens.

The record does not show any formal tender or offer to return this property by Byrn to Hawkins and associates. There were some negotiations between Ragsdale, an employee of the Nashville corporation, who went out to Texas after the deed was made, and Hawkins and associates about rescinding the trade, but nothing came of them.

Byrn was not justified in abandoning the machinery. He should not have left it exposed to marauders, or to the elements, or to lien claimants, as apparently he did. The property had been turned over to him, and it was his duty to preserve it, at least until a tender thereof to its former owner. He is not entitled to a rescision upon such conduct.

We are asked to indulge the presumption that a state of things once established will be supposed to continue until the contrary is shown; that is to conclude that the well-drilling outfit, having been left on the property, it is still there, and in as good condition as when abandoned.

We think such a presumption cannot be entertained here. It conflicts with natural laws, and doubtless with the laws of Texas. The restoration of this machinery to Hawkins and associates would be a condition of the rescission sought and the recovery of their money by Byrn and the Wichita-Homer Oil & Refining Company. They must show that it is possible for them to comply with such condition. As the case stands, they do not even know where the property is and nothing of its plight. A court of equity cannot aid them upon such an appearance.

It results that in our opinion neither the original complainant nor the cross-complainants are entitled to any relief. The chancellor's decree will accordingly be modified. The bill and the cross-bill will both be dismissed, and the costs of the cause divided between the parties.

One party has been convicted by the jury of fraud. The other, seeking equity, has disabled himself to do equity. The court can therefore help neither.