RALPH E. SCHURTZ, Appellant, v. C. C. CUSHING, JR.—146 S. W. (2d) 591.

Division One, January 4, 1941.

W. Rea Heath and Glenn R. Donaldson for appellant.

114

*Watson, Ess, Groner, Barnett & Whittaker* for respondent.

BRADLEY, C.—This is an action, in two counts, to cancel a $10,000 note and an assignment of a half interest in patents, and (second count) to recover on a $2,000 note. The cause was tried (September 12, 1938) before Judge Darius A. Brown, Kansas City, and at the close of plaintiff's case, defendant interposed what may be termed a demurrer to the evidence. The court stated that the demurrer was overruled, but upon ascertaining that defendant would not offer any additional evidence (on cross-examination defendant offered some exhibits), the court stated that he would let the demurrer ride till briefs were in.

While the cause was so pending, Judge Brown died. Thereafter the cause was submitted to Judge W. F. Woodruff on a transcript of the proceedings before Judge Brown. Judge Woodruff found for defendant and against plaintiff on both counts.

Plaintiff, who lived in Kansas City, was the owner of three patents pertaining to a refrigerating device. July 7, 1931, he and defendant, who lived in St. Louis, entered into a contract in which it was recited that the device was ready for production and marketing and that plaintiff was arranging the formation of a corporation ''for operating under rights of said patents'' and that defendant was ''desirous of becoming interested'' in the corporation to be formed, and it was agreed as follows:

(1)   Defendant was to pay to plaintiff $20,000—$10,000 down, $2,000 in 30 days, and $8,000 on or before September 20, 1931.

(2)   A domestic corporation was to be formed with capital stock of not over 100,000 shares "with a sales value starting at $25 per share," and "for each dollar" of the $20,000 paid to plaintiff by defendant, defendant was to receive "eighty cents worth of stock at the present sales price."

(3)   Until the corporation was completed plaintiff was to place in escrow with the First National Bank, Kansas City, an assignment to defendant of a one-half interest in the patents "as security for the delivery of said stock," 80 cents worth to the dollar as stated in (2).

(4)   The stock of the corporation was to be placed on the market, and plaintiff was to set aside 25% "of the net receipts" from the sale of stock to be paid to defendant until he "shall have received within one year from this date a sum equal to the total amount paid by him to first party (plaintiff) under the terms of this agreement."

(5)   Defendant had the option, "at the time of payment of said receipts from sale of stock tendered him, of accepting the cash or of accepting an equal value in stock in said corporation at the present sale price in lieu of cash."

(6)   Plaintiff had the option "of declining to accept the money ($8,000 to be paid on or before September 20th) and of carrying out of this agreement."

(7)   As security for the payment to defendant of 25% of net receipts from the sale of stock, plaintiff was to place in the escrow 50% of his "51% control stock."

(8)   Plaintiff was to pay defendant 6% "on the amount which represents the difference between the sum paid by second party (defendant), according to the terms of this agreement, and the amount received by second party from the receipts of said stock."

The escrow receipt, approved by signature of plaintiff and defendant, recited: "Assignment of patents is to be held by escrow agent until delivery is made of 50% of first party's control stock of corporation to be formed. Assignment is then to be returned to first party. The stock is to be deposited accompanied by a letter signed by both parties stating that the deposit consists of 50% of first party's 51% control stock of the corporation. *Upon repayment to second party of funds advanced to first party, the stock is to be* returned to first party" (Italics ours).

In addition to the contract, the assignment and the escrow, there was executed, on July 7, 1931, the $10,000 note sought to be cancelled, signed by plaintiff, payable to defendant, and due one year, and the $2,000 note, upon which recovery is sought, signed by defendant, payable to plaintiff, and due one year. And on that date, defendant delivered $10,000 to plaintiff, and plaintiff returned $2,000 to defendant. The notes and all the documents and transactions mentioned

grew out of and pertained to the patents and the contemplated corporation.

The preliminary draft of the contract of July 7th was made in the office of the plant in Kansas City where machines containing plaintiff's patented device were being manufactured, and this draft was made principally by plaintiff's associate, Mr. Tutt, who "had considerable experience in drawing certain contracts." Plaintiff said that he thought he "ran the typewriter for" Mr. Tutt, and that after "we laid out a preliminary draft," defendant "came and went over it, changed it. There were some differences he wanted and he arranged to make the final draft."

So far as appears, neither party consulted counsel about the contract, but shortly after depositing the assignment in escrow, plaintiff saw his attorney (Mr. John W. Hudson, Kansas City) about forming the corporation, and articles of incorporation were drawn to incorporate the Schurtz Refrigeration Systems, Inc., and these articles were filed with the Secretary of State, etc., and certificate of incorporation issued July 21, 1931. The articles provided for 200,000 shares, no par value, with equal voting privileges, and 100,000 shares were called class A common, but were preferred in named particulars, and 100,000 shares were called class B common. Mr. Hudson did not have before him the contract of July 7th, and made the capital structure as directed, we may say, by plaintiff. However, "the articles were finally approved" by defendant when he was in Kansas City, September 2, 1931. [See infra.]

The articles recited that "the capital with which the corporation will commence business" was $2,000; that plaintiff subscribed for 90,000 shares of class B; R. N. Tutt 9995 shares, and 5 others 1 share each, all class B. None of class A was subscribed.

August 17, 1931, defendant got information to the effect that his assignment placed in escrow might not be prior to other claims on the patents, and on that date he wired plaintiff that "developments to date make it imperative that you see me in St. Louis immediately." Plaintiff was away "on a trip" about that time, and did not see defendant until September 2nd, on which date, defendant, with his attorney (Mr. Walter A. Hill, St. Louis) appeared in Kansas City. The articles of incorporation, although the capital structure was not as contemplated in the contract of July 7th, were, as stated, approved by defendant, according to the evidence of Mr. Hudson, and there was nothing to the contrary. Hill made objections to the form of the assignment that was placed in escrow, and had prepared and brought with him, a new form of assignment, and plaintiff agreed to and did sign the new form. He signed "R. E. Schurtz." Hill made objection to the *form* of signature; said it should have been signed "Ralph E. Schurtz." Thereupon plaintiff added to the R the letters *alph,* slanting upward. Hill still objected, and plaintiff

then signed a second copy, "Ralph E. Schurtz." After plaintiff had signed the second copy, according to Hudson, Hill asked him if he, Hill, could have "for his file" the copy that was signed with the *alph* slanting upward, and Hudson "told him certainly, he could have a copy of it for his files," and Hill took that copy. Then plaintiff, defendant and Hill went to the escrow bank to substitute the new or second assignment for the first one. Instead of depositing with the bank the assignment that was signed Ralph E. Schurtz, Hill deposited the *alph* copy and retained the other, which was filed in the U. S. patent office without the knowledge or consent of plaintiff.

September 14, 1931, Hill wrote Hudson that "after a thorough investigation" he had come to the conclusion that plaintiff "never intended to go through with his agreement with Mr. Cushing;" that notwithstanding plaintiff's denials (September 2, 1931) that he had assigned to others "any of his rights under his patents, the records in the patent office show" that back in 1927 and 1928, he had assigned to others (naming them) interests in the patents. And complaint was made in the letter about the capital structure of the corporation and of paragraph (f) of the articles, by which paragraph, Hill said plaintiff "intended that the corporation pay approximately $100,000 of his personal debts;" that "there are a number of other reasons why I cannot advise my client to go any further with his contract with Mr. Schurtz. Since we have taken the position that your client has breached his contract and never intended to fulfill same, I have advised my client to record his assignment in the office of the Commissioner of Patents, which I understand he has done. . . . I see no other way whereby my client can be secured."

It is stated in plaintiff's brief that after efforts at adjustment of differences had failed, plaintiff filed in the U. S. patent office photostatic copies of the contract of July 7th, the escrow agreement, and the *alph* assignment "as a warning and notice of the real intent of said purported assignment to any possible subsequent purchasers of Cushing's claimed interest."

It is quite clear that plaintiff executed the assignment to a one-half interest in his patents to secure the performance on his part of the contract of July 7, 1931, and to secure the money advanced by defendant; and it is equally clear that he did not intend for such assignment to be filed in the U. S. patent office, and defendant, in effect, so concedes, but defends such filing under the first law, *self preservation*. Note excerpt from Hill's letter, supra, where he said that he knew of no other way (except filing in patent office) whereby defendant could be secured for the money he had advanced.

But even though the filing of the assignment in the patent office was unauthorized, such does not, of itself, under the facts, justify the cancellation sought and recovery on the $2,000 note. Each party charges the other with breaching the contract, but as we see it, plain-

tiff cannot have cancellation as he demands and recovery on the $2,000 note, regardless of who breached the contract.

Plaintiff wants to retain the $8,000 received from defendant, cancel the assignment, and the $10,000 note, and collect on the $2,000. In other words, plaintiff would have forfeited to him all that he got under the contract, but return nothing. There was no forfeiture provision in the contract. "The books are full of decisions that if a party would rescind a contract for fraud or other cause, he must, as far as in his power, put the other party in the condition he would have been in had the contract not been made." [Jarrett v. Morton, 44 Mo. 275, 1. c. 278.]

"Before a forfeiture can occur there must be no question, from the provisions of the contract under which it is attempted to enforce a forfeiture, that the parties so intended. Forfeitures are enforced only where there is the clearest evidence that that was what was meant by the stipulation of the parties." [Allen v. Meredith et al. (Mo. App.), 32 S. W. (2d) 103, 1. c. 107; 6 R. C. L., p. 906, sec. 291.]

Plaintiff made no offer to return to defendant the $8,000 that he retained and used, and made no such tender in his pleading. "It is fatal to plaintiff's case, that on discovering the alleged fraud and deceit upon which he bases his action, he did not promptly rescind, or offer to rescind the contract, and return or offer to return the property he acquired by reason thereof. And such rescission must be *in toto*. A party cannot affirm a contract in part, and repudiate it in part. He cannot accept its benefits on the one hand, while he shirks its disadvantages on the other. He cannot play fast and loose in the matter." [Estes v. Reynolds, 75 Mo. 563, 1. c. 565. See also Robinson v. Siple et al., 129 Mo. 208, 1. c. 220, 31 S. W. 788; Sellner v. Meyer (Mo. App.), 240 S. W. 247; Ebel v. Roller et al. (Mo. App.), 21 S. W. (2d) 214, 1. c. 216.]

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.