EASTERN STATES PETROLEUM CO., INC., a Delaware corporation,

*vs.*

UNIVERSAL OIL PRODUCTS COMPANY, a Delaware corporation.

*New Castle, April 5, 1946.*

*Arthur G. Logan,* for complainant.

*Clarence A. Southerland,* (of the firm of Southerland, Berl & Potter), (*Ralph S. Harris* and *Frederick W. P. Lorenzen,* both of New York City, of counsel), for defendant.

HARRINGTON, Chancellor: Eastern States Petroleum Co., Inc., by its bill sought to be subrogated to the original rights of Asiatic Petroleum Corporation against Universal Oil Products Company, with respect to $250,000 in sealed notes, which were surrendered by Asiatic to Universal in 1940. The defendant's demurrer thereto was sustained on the ground that "subrogation does not apply when a complainant merely pays his own debt, and not the debt of another, though incidental benefits may thereby accrue to the defendant." 28 *Del. Ch.* 365, 44 *A.* 2d 11, 16. Other relief was also sought by the complainant, but those prayers have been abandoned. The complainant now seeks to amend its bill by striking out certain paragraphs and by substituting others, but no change is sought in the first thir-

teen paragraphs, and the question is whether the defect on which the demurrer was sustained, would be cured by the proposed amendment. The original bill was set out in the opinion previously filed.

Paragraph 14 contained the complainant's original version of the February 1, 1940 settlement between Universal Oil Products Company and Eastern States Petroleum Co., Inc., to which Asiatic Petroleum Corporation also appeared to have been a party. The new paragraph sought to be substituted therefor specifically refers to the documents involved in that transaction, which are attached as exhibits.

The proposed amendment alleges:

"At the time the Special Master rendered his Report (to this court) in the summer of 1940, * * *, and on September 1, 1940 the anti-trust action which Eastern States had pending against Asiatic Petroleum Corporation and Shell Union Oil Corporation and others, as aforesaid, was at issue and ready for trial * * *. At the same time Asiatic Petroleum Corporation owned and held $250,000 in principal amount of sealed promissory notes which had been issued by Universal. Said notes gave the holder thereof a claim against earnings of Universal superior to that of a general creditor's claim and, in the hands of Asiatic Petroleum Corporation, constituted an obligation owed by Universal to Asiatic Petroleum Corporation. At the same time Universal was asserting a claim for royalties against Eastern States * * *, but due to a fraud which Universal had perpetrated on Eastern States, more specifically hereinafter set forth, Universal did not have a legal, moral, or valid claim of any kind against Eastern States at the time. For some time shortly before and shortly after September 1, 1940 negotiations were had which resulted in Eastern States' assets, consisting of said action against Asiatic Petroleum Corporation, being used to pay Universal's debt to Asiatic Petroleum Corporation."

The proposed amendment, therefore, makes no change of any real importance in the original bill until the mode of using Eastern's assets is alleged. These allegations are more specific.

Subparagraph (a), in substance, alleges that on Sep-

tember 5, 1940 the "unexecuted" settlement agreement, dated September 1, 1940, "was presented to Eastern States with the request that it sign" it; that at the same time a form of release of Eastern States' action against Asiatic Petroleum Corporation was also presented, "with the request that Eastern States sign the same and place it in escrow until Universal had completed arrangements with Asiatic Petroleum Corporation and executed said agreement dated as of September 1, 1940."

Subparagraph (b) alleges that prior to September 7, 1940, Eastern States "signed" the settlement agreement, dated September 1, 1940, and the release, "turned over said agreement to Universal and placed said release in escrow subject to the control of Universal, in that Universal was put in a position where by completing arrangements with Asiatic Petroleum Corporation and by signing said agreement it could obtain a discharge of said release (of Eastern to Asiatic) from escrow and cause said release to be delivered to Asiatic Petroleum Corporation."

Subparagraph (c) alleges that between September 7, 1940, and September 12, 1940, Universal negotiated with Asiatic Petroleum Corporation and completed arrangements with it "whereupon Universal caused the release which Eastern States had executed and placed in escrow * * * to be freed from escrow and delivered to Asiatic Petroleum Corporation and in exchange therefor, Universal obtained from Asiatic Petroleum Corporation a discharge of the obligation owed by Universal to Asiatic Petroleum Corporation on the $250,000 of sealed promissory notes in that Asiatic Petroleum Corporation delivered the same to Universal for cancellation."

The same paragraph then alleges that "Eastern States was not advised by anyone and did not know until the spring of 1941 that Universal through the use of Eastern States' said asset was able to cause Asiatic Petroleum Corporation to discharge the obligation owed by Universal to Asiatic Pe-

troleum Corporation by delivering said notes to Universal for cancellation."

Subparagraph (d) alleges that Universal, through fraud, "had put itself in a position whereby it obtained possession of the agreement signed by Eastern States, * * * with the power to free the release, * * * from escrow", and whereby it "was able as a result of the fraud to use the property of Eastern States, consisting of its action against Asiatic Petroleum Corporation and others, to obtain a discharge of the obligation owed on the notes."

The same paragraph also alleges that the agreement, dated, as of September 1, 1940, provides:

"That Eastern States should allow Universal to inspect its plant, to determine whether or not, at September 1, 1940, the operations of Eastern States involved cracking oil under any of the Letters Patent of which Universal was the owner or under which it had the right to grant licenses, with a provision for arbitration in the event that the parties could not agree."

The proposed new paragraphs 16, 19, 20 and 21 allege:

"16. When Eastern States entered into the License Agreement, * * *, on December 19, 1935, and when it entered into the Agreement of September 1, 1940, * * * and placed the release of its action against Asiatic Petroleum Corporation in escrow, subject to Universal's control, it did so in the belief that the decision rendered by Judge Davis in the Root Refining Company case, which Universal had used as the basis of its threat to sue Eastern States for infringement, in the event it built a cracking plant and did not take a license from Universal, had been a proper and honest decision. Eastern States had no occasion, prior to the Spring of 1941, to suspect said decision as being corrupt.

* * * * * *

"19. The decision in the Globe Oil & Refining Company case coupled with the decision in the arbitration proceedings above mentioned, shows that at no time was Eastern States legally or morally liable to Universal for any royalties or for any claim based on infringement.

"20. But for the fraud practiced upon it by Universal through the threats and use by Universal of the decision in the Root Refin-

ing Company case as aforesaid, Eastern States would not have entered into the License Agreement of December 1935, * * *, would not have entered into the Settlement Agreement dated as of September 1, 1940, * * * and would not have executed and delivered in escrow, subject to Universal's control, the release of its action against Asiatic Petroleum Corporation and others, for three-fold damages, which damages were in the sum of $2,662,917.54, and but for said fraud Universal would not have been able to obtain control of Eastern States' assets, consisting of said cause of action, and to have used the same to pay Universal's debt to Asiatic Petroleum Corporation, represented by its outstanding notes in the principal sum of $250,000.

"21. Due to the fraud practiced upon it as aforesaid, Eastern States has suffered damage, and Universal has profited, in that Eastern States' assets were used to pay Universal's debt, as hereinafter set forth."

The complainant attached to the proposed amendment as exhibits copies of:

(1) The September 1, 1940 assignment by Universal Oil Products Company to Asiatic Petroleum Corporation of "all right, title and interest of Universal in and to any claims which Universal may have against Eastern States Petroleum Co., Inc., * * * under the License Agreement dated December 1935 between Universal and Eastern, as supplemented by a letter, dated the same date including any and all royalties payable by Eastern, to September·1, 1940."

(2) The settlement agreement of September 1, 1940 between Universal Oil Products Company and Eastern States Petroleum Co. Inc., executed by both parties;

(3) The release of Eastern States Petroleum Co. Inc., to Asiatic Petroleum Corporation and others, dated September 1, 1940, of its alleged right of action for the violation of the Sherman Anti-Trust Act, 15 U.S. C.A. §§ 1-7, 15 note; and

(4) A license, dated as of September 1, 1940, from Eastern States Petroleum Co. Inc., to Universal Oil Products

Company, authorizing the use of certain patent rights by that company.

The settlement agreement between Universal and Eastern States first recites their "desire to settle the litigation between them now pending in the courts of the State of Delaware on the terms herein set forth." It then provides a method whereby the pending bills in equity shall be dismissed, and the action at law of Universal against Eastern States discontinued. After reciting the assignment of September 1, 1940 by Universal to Asiatic Petroleum Corporation, it provides that "Universal will cause Asiatic Petroleum Corporation to release and discharge Eastern of and from all liability under said License Agreement to September 1, 1940, including all royalties due and payable by Eastern to said date"; and that the License Agreement of December 1935 shall be cancelled as of September 1, 1940.

Other provisions seem unimportant.

The release by Eastern States to Asiatic Petroleum Corporation and others recites the pending suit for the alleged violation of the Sherman Anti-Trust Act, and that the parties "have settled their differences and have agreed to discontinue said suit." It then provides that "in consideration of a release given simultaneously herewith by Asiatic Petroleum Corporation to Eastern States Petroleum Co. Inc., the discontinuance of a certain other action brought by Universal Oil Products Company against Eastern States Petroleum Co. Inc., in the Court of Chancery of the State of Delaware, in and for New Castle County, and of other things of value, receipt whereof is hereby acknowledged," Eastern releases, etc.

No copy of the recited simultaneous release by Asiatic Petroleum Corporation to Eastern States is attached to the bill.

The contemplated amendment alleges that Eastern States knew nothing of the surrender of Universal's notes by

Asiatic until 1941. Eastern says that by reason of Universal's fraud in 1935, likewise unknown until 1941, Universal was put in a position whereby it was enabled to bring about the settlement contract of 1940, and the execution and delivery of Eastern States' release, by which Universal was able to use Eastern's right of action against Asiatic in exchange for the surrender of Universal's notes.

At an earlier stage of this case (28 *Del. Ch.* 365, 44 *A.* 2d 11), it was pointed out:

(1) That subrogation ordinarily depends upon the application of principles of equity and justice rather than upon any semblance of contract rights;

(2) It is based on the theory that "somewhat the same equity operates which seeks to prevent the unjust enrichment of one person at the expense of another by permitting actions for reimbursement, contribution and exoneration, and in appropriate cases creates a relation somewhat analogous to a constructive trust";

(3) "One who pays the debt of another at his direct or indirect request is, therefore, usually entitled to subrogation";

(4) Moreover, "one who is induced by fraud to pay the debt of another is, ordinarily, not a mere volunteer and may rely on subrogation";

(5) Originally, subrogation was restricted to a limited class of cases, but "when right and justice demand it the tendency is to extend, rather than to restrict, its application."

The remedy applies when "property of one person is used in discharging an obligation of another\* \* \* under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred. *Restat. Law of Restitution,* § 162, *and Comment* (a).

"Where a person wrongfully uses property of another

in discharging an obligation of the wrongdoer to a third person * * * the other is entitled to be subrogated to the rights which the third person had before the obligation * * * was discharged." *Restat. Law of Restit.*, § 207. See also, *Wilson v. Todd*, 217 *Ind.* 183, 26 *N.E.2d* 1003, 129 *A.L.R.* 182, 196. That principle seems to be the important one.

Under the allegations of the amendment, the fact that no fraud was actually perpetrated by the defendant in 1940 is not a controlling factor. It appears that the fraud of 1935 induced the entire settlement transaction and enabled Universal to pay its debt to Asiatic with Eastern States assets, and without Eastern's knowledge. The defendant claims that exhibits show that Eastern States merely paid its own debt to Universal, and, no matter when the transaction took place between Universal and Asiatic resulting in the surrender of Universal's notes, it was a separate and distinct matter on which subrogation cannot be based. The demurrer to the original bill was sustained on that ground. See 28 *Del. Ch.* 365, 44 *A.2d* 11.

The reasonable inference from the settlement agreement of September 1, 1940 is that Eastern States merely intended to pay its supposed debt to Universal. By an instrument bearing the same date, Universal assigned all of its rights under the license agreement of 1935 to Asiatic Petroleum Corporation. By the settlement contract, Universal also agreed that it would cause Asiatic to release to Eastern States all of its rights, as assignee, including all royalties due to September 1, 1940, and a method of disposing of the pending litigation between Universal and Eastern States was agreed on. As we have seen, both specific and general language with respect to the consideration for Eastern's release appears in that instrument. Eastern's desire to settle its controversy with Asiatic is also recited.

When the whole transaction of 1940 is considered, it is, therefore, apparent that Asiatic took some part in it,

though it was not a party to the executed contract. Moreover Eastern's intent is not a controlling factor. The nature of the negotiations and arrangements between Universal and Asiatic, prior to the delivery of Eastern's release does not appear, and neither the amendment nor the exhibits show an agreement by Asiatic to surrender Universal's notes as a part of the settlement transaction. Under the circumstances, nothing is accomplished by stressing the meaning of the general phrase "and of other things of value" in Eastern's release as an allegation of fact. The fraudulent and improper use of Eastern's asset to pay Universal's debt is the important allegation. As already stated, at the time of the execution of the settlement contract, Universal assigned all of its rights against Eastern States to Asiatic, Eastern States released its right of action against Asiatic, and Asiatic as assignee likewise released its rights under the license agreement to Eastern States. Furthermore, because of Universal's fraud, the entire transaction resulted in Universal being benefited in the amount of $250,000. "Jurisdiction to administer subrogation rests largely on the prevention of frauds" (50 *Am. Jur.* 705) ; and the complainant should be given an opportunity to prove its charges.

In discussing the law of trusts, it has been pointed out that:

"Where the wrongdoer uses the claimant's money in purchasing a chose in action, he holds the chose in action upon a constructive trust for the claimant. Where the wrongdoer uses the claimant's money in discharging the chose in action, the wrongdoer holds nothing of which he can be charged as constructive trustee. The claimant is entitled, however, to the benefit secured by the wrongdoer, through the use of his money. This benefit is secured to him through the device of subrogation." 3 *Scott on Trusts* § 513.

Somewhat the same general principle governs this case. *Wilson v. Todd,* 217 *Ind.* 183, 26 *N.E.*2d 1003, 129 *A.L.R.*192.

Viewed from this standpoint, the allegations emphasized in sustaining the demurrer are not the important ones. The

difficulty of the question justifies what practically amounts to its reargument in this manner. Moreover, the original bill emphasized Eastern's payment of its debt to Universal.

An order permitting the amendment will be entered in accordance with this opinion.