EASTERN STATES PETROLEUM CO., INC., a Delaware corporation,

*vs.*

UNIVERSAL OIL PRODUCTS COMPANY, a Delaware corporation.

*New Castle, October* 28, 1946.

306

*Arthur G. Logan,* of the firm of Logan & Duffy, for complainant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, and *Frederick W. P. Lorenzen,* of New York City (Ralph S. Harris, John A. Wells and K. William Michelson, all of New York City, of counsel), for respondent.

HARRINGTON, Chancellor: This is a reargument of the motion of Eastern States to amend its subrogation bill after a demurrer thereto had been sustained for an apparent lack of equity. See 28 *Del. Ch.* 365, 44 *A.* 2d 11. After the first argument on the complainant's motion, this court concluded that the proposed amendment should be permitted on the ground that it alleged that Universal Oil Products Company had wrongfully used Eastern States' property rights to pay Universal's debt of $250,000 to Asiatic Petroleum Corporation. See *ante* p. 112, 46 *A.* 2d 553, citing *Wilson v. Todd,* 217 *Ind.* 183, 26 *N.E.2d* 1003, 129 *A.L.R.* 192; 3 *Scott on Trusts,* § 513; *Restat.Law of Restit.* §§ 162, 207.

Both the contemplated amendment and the exhibits attached thereto are quite voluminous, and Universal Oil Products Company claims that notwithstanding the complainant's method of pleading, when the exhibits are considered it clearly appears that no decree could be entered subrogating Eastern States to the original rights of Asiatic Petroleum Corporation against Universal Oil Products Company, and that the motion to amend should be denied.

The allegations of the proposed amendment were set out in some detail in the opinion being reconsidered, but a more complete statement of the basic facts seems desirable:

(1) Universal Oil Products Company secured Eastern's execution of the license agreement of December 19, 1935 by representing in its letter of July 3, 1935 (not at-

tached to the bill) that it had "a formidable patent structure consisting of thousands of patents and applications"; that the United States Circuit Court of Appeals in the Third Circuit had unanimously affirmed the opinion of the District Court holding that Root Refining Company had infringed Universal's patents in using the so-called Winkler-Koch Cracking Process and that Eastern's proposed use of a Winkler-Koch unit would infringe Universal's patents; and that the defendant's representation as to the affirmance of the judgment in the Root case was untrue and fraudulent.

(2) By the license agreement of December 19, 1935, Universal not only represented to Eastern that it was the "owner of the Dubbs Cracking Process (involved in the Root case) for the cracking of petroleum, tars, and other hydrocarbons, carbonaceous or carbon containing materials (hereinafter referred to as 'oil')", but also that it was the owner of, or had the right to grant licenses under, other patents of which a partial list of 456 was set forth. Paragraph 2 of the license agreement provided in part that:

"Universal grants to licensee (Eastern) a non-exclusive and non-assignable license to crack oil (not including so-called hydrogenation with or without catalysts) at Houston, Texas under all Letters Patent under which Universal now has or may hereafter have the right to grant licenses, subject however to any restrictions and limitations on Universal's right to grant licenses thereunder and subject to the other terms and conditions of this agreement."

(3) Litigation relating to the license agreement was thereafter begun by Universal and Eastern. Universal sued for royalties accruing thereunder between May, 1936 and March 1, 1937. Eastern sued for rescission of the license agreement upon the ground that Universal had fraudulently represented the yields obtainable by use of Universal's cracking process, and Universal filed a cross bill to enforce the payment for royalties due under the license agreement. The matter was referred to a Special Master by this court who on June 27th, 1940 filed a final report which recommended

that Eastern's bill be dismissed and stated that the Master would determine the royalties owed by Eastern to Universal for the period from May, 1936 to the date of the decree.

(4) This litigation between Universal and Eastern was settled by an agreement dated as of September 1, 1940 which (a) provided for the discontinuance of the Delaware litigation; (b) recited that Universal had theretofore assigned to Asiatic Petroleum Corporation all of Universal's claims against Eastern States for unpaid royalties under the December 19, 1935 license agreement, and by which Universal agreed to cause Asiatic to release Eastern from all liabilities under that agreement up to September 1, 1940; (c) the license agreement of 1935 was to be cancelled and terminated as of September 1, 1940; (d) Eastern agreed to permit inspection of its plant by Universal's engineers and Universal and Eastern agreed to submit the question of any patent infringement by Eastern to arbitration; and it was provided that if the arbitrators found infringement Universal would license Eastern and Eastern would enter into a license agreement under which Universal would receive the lowest royalty payable to Universal by any other of its licensees; (e) Universal also agreed to grant patent licenses to Eastern under two refining processes known respectively as the "Sulfuric Acid Alkylation Process" and the "Non-selective Polymerization" process. Eastern likewise agreed to grant to Universal a fully paid up license under one letter patent. The consideration paid by Eastern for these legal rights and privileges received by it consisted of a release of its alleged rights in the anti-trust suit against Asiatic and others, which was attached to the proposed amendment. That instrument stated that it was

"In consideration of a release given simultaneously herewith by Asiatic Petroleum Corporation to Eastern States Petroleum Co., Inc., the discontinuance of a certain other action brought by Universal Oil Products Company against Eastern States Petroleum Co., Inc., in the Court of Chancery * * * and of other things of value, receipt whereof is hereby acknowledged."

(5) Eastern alleges that in the spring of 1941 it ascertained certain facts which caused it to believe that the decision in the *Root Refining Company. case*, 78 *F.* 2d 991, had been obtained by Universal's fraud and that Universal was "accountable to Eastern States for the damage occasioned to Eastern States through the use made by Universal of said decision to induce Eastern States to enter into the license agreement."

(6) Eastern alleges that when it entered into the original license agreement of December 19, 1935 and the settlement agreement of September 1, 1940, and when it released its alleged cause of action against Asiatic Petroleum Corporation to Universal, it "did so in the belief that the decision" in the *Root Refining Company* case had been a proper and honest decision. It also alleges that it would not have taken any of these steps but for the fraud practiced upon it in 1935, with respect to the *Root Refining Company* decision.

Another paragraph of the proposed amendment alleges that subsequent events, including the award in the arbitration held under the September 1, 1940 settlement agreement and a decision of the United States Supreme Court, long after any of the events here complained of took place, established that Eastern was not in fact legally or morally liable to Universal for royalties or for any claims based on infringement;

(7) Eastern also alleges that, unknown to it, Universal surrendered to Asiatic Petroleum Corporation Eastern's release of the claim against Asiatic in exchange for $250,000 of Universal's outstanding sealed promissory notes held by Asiatic;

(8) From these facts, Eastern concludes that it "has suffered damage and Universal has profited, in that Eastern States' assets were used to pay Universal's debt."

The only substantial prayer for relief is that Eastern "be subrogated to the same position as that enjoyed by Asi-

atic Petroleum Corporation" with respect to the $250,000 of notes theretofore surrendered by Asiatic to Universal.

Subrogation is but one of the general equitable remedies for the prevention of unjust enrichment and is governed by substantially the same principles of right and justice which govern the imposition of a constructive trust on a wrong-doer. 5 *Pom.Eq.Jur.,* (*4th Ed.*) 5196; *Restat. Law of Restitution* § 162; 28 *Del. Ch.* 365, 44 *A.* 2*d* 11. With that principle in view, subrogation, therefore, applies to a great variety of facts. *Ante* p. 112, 46 *A.* 2*d* 553.

The demurrer to the original bill was sustained because it appeared that Eastern States had merely paid its own debt to Universal and subrogation was not applicable, though Universal had also received other incidental benefits in a separate transaction with Asiatic Petroleum Corporation. 28 *Del. Ch.* 365, 33 *A.* 2*d* 11; *ante* p. 112, 46 *A.* 2*d* 553.

Some allegations of the original bill are omitted, but in opposing the motion to amend Universal claims: (1) That the exhibits attached to the proposed amendment require the same conclusion as to the complainant's lack of equity; (2) that under the guise of subrogation, Eastern States cannot, in effect, seek the aid of this court to rescind the settlement agreement of September 1, 1940 and recover substantially the entire consideration paid, without alleging an offer to return the benefits received under it; (3) that, while fraud is alleged, Eastern States received substantial considerations in exchange for the release of its alleged rights against Asiatic, and, at the most, the settlement agreement of September 1, 1940 was merely voidable at Eastern's election, so there was no wrongful use of Eastern's assets by Universal to pay its debt to Asiatic Petroleum Corporation, and *Wilson v. Todd,* 217 *Ind.* 183, 26 *N.E.* 2*d* 1003, 129 *A.L.R.* 192; 3 *Scott on Trusts,* § 513, and *Sections* 162 *and* 207 of the *Restatement of the Law of Restitution* are not applicable; and (4) that the alleged fraud was discovered in 1941 and the delay in rescinding the settlement agree-

ment, as well as the subsequent acts under it in connection with the arbitration and award therein provided for, conclusively show an affirmance of that agreement, so that rescission and subrogation cannot be relied on under any circumstances. See *Richardson v. Horn*, 8 *Houston* 26, 31 *A.* 896; *Leech v. Husbands*, 4 *W. W. Harr.* (34 *Del.*) 362, 152 *A.* 729; *Mackenzie Oil Co. v. Omar Oil & Gas Co.*, 4 *W. W. Harr.* (34 *Del.*) 435, 154 *A.* 883; *Staley v. McNerney*, 233 *Iowa* 1065, 10 *N.W.* 2d 584; *Restat. Law of Restit.* § 68*b*.

In determining any of these questions, the facts must be considered as though the allegations were before the court on demurrer.

The second objection will be considered first.

The complainant alleges that the license agreement of December 19, 1935 was procured by fraud and that the same fraud induced the settlement agreement of September 1, 1940. As a result of that agreement, Eastern States received (1) a release from the claims of Universal for unpaid license fees, involved in the Delaware litigation, and the cancellation of the 1935 license agreement; (2) an agreement to arbitrate any future questions of patent infringements, to license Eastern States at minimum royalty rates, in the event of such infringement, and, ultimately, an award in its favor by the arbitrators; and (3) a license from Universal to use the sulfuric acid and polymerization patents.

The considerations paid Eastern States for these rights, privileges and immunities were not set out in the settlement agreement of September 1, 1940. It appears, however, that they mainly consisted of a release by Eastern of its alleged claims in an anti-trust suit then pending in a United States District Court in the State of New York against a group of corporations, including Asiatic Petroleum Corporation, and the grant of a patent license to Universal Oil Products Company. Asiatic Petroleum Corporation did not execute

the settlement agreement, but it is evident that it participated in that transaction. See *ante* p. 112, 46 *A.* 2d 553. Eastern's release to Asiatic stated that it was:

"In Consideration of a release given simultaneously herewith by Asiatic Petroleum Corporation (as assignee) to Eastern States Petroleum Co., Inc., the discontinuance of a certain other action brought by Universal Oil Products Company against Eastern States Petroleum Co., Inc., in the Court of Chancery * * * and of other things of value, receipt whereof is hereby acknowledged."

Ordinarily, equity will not impose a constructive trust for the benefit of the complainant, in effect, seeking the rescission of a fraudulent contract, and, as an incident of that right, the recovery of the consideration paid unless the benefits received are returned and the *status quo ante* is substantially restored. *Hegarty. v. American Commonwealth Power Corporation,* 18 *Del. Ch.* 86, 163 *A.* 616; see also *Kelly, Com'r., v. International Re-Insur. Corporation,* 20 *Del. Ch.* 184, 174 *A.* 267; *Schurtz v. Cushing,* 347 *Mo.* 113, 146 *S.W.* 2d 591. Even a defrauded complainant cannot accept the benefits received under a contract on the one hand and shirk its disadvantages on the other. In other words, it cannot cause the rescission of a contract in part and its approval in part, as self interest may dictate. *Hegarty v. American Commonwealth Power Corporation, supra; Schurtz v. Cushing, supra;* see also *Kelly, Com'r., v. International Re-Insur. Corporation, supra; Merry Realty Co. v. Shamokin & Hollis etc. Co.,* 230 *N.Y.* 316, 130 *N.E.* 306. That rule is based on the maxim that "he who seeks equity must do equity." 12 *C.J.S.,* § 44, *pages* 1004, 1005; 9 *Amer. Jur.* 384. In appropriate cases, it is doubtless true that if a "just and equitable restoration cannot be made by the parties, then the contract must stand and the petitioner, if aggrieved by fraud, must look for relief to its appropriate remedy for damages." *Hegarty v. American Commonwealth Power Corporation.* Notwithstanding the general rule, there are cases where the complete administration of justice between the parties does not require the return of property acquired under a fraudulent contract,

in order that it may be rescinded. 12 *C.J.S.*, § 44, *p.* 1005; 17 *C.J.S.*, § 439, *p.* 923; *Black on Resc. & Cancel.*, (2d ed.) 621, 622; *Hernig v. Harris*, 117 *N.J. Eq.* 146, 175 *A.* 169. That is true when the defrauded party has received nothing under the contract which it was not entitled in any event to retain, or what it has received is utterly worthless and of no possible use or benefit to the defendant. 17 *C.J.S.*, 923; 18 *Ency. Pl. & Pr.* 834; *Williston on Contracts*, (*Rev. Ed.*) 1530; *Du Pont v. Du Bos*, 52 *S.C.* 244, 29 *S.E.* 665; *Hernig v. Harris, supra.* The same general principles of substantive law ordinarily apply where, though subrogation is sought, the complainant's rights are primarily based on a decree rescinding an alleged fraudulent contract.

When a contract is severable or divisible, each part may be independent for the purpose of rescission (3 *Black on Resc. & Cancel.*, (2d Ed.) § 585), but that principle does not apply to the settlement agreement. See *Hegarty v. American Commonwealth Power Corporation, supra; Orenstein v. Kahn*, 13 *Del. Ch.* 376, 119 *A.* 444. The reasonable inference from its provisions and the surrounding circumstances is that it was intended to be entire, and not a divisible contract. Following the recital that the parties "desire" to settle the pending litigation, it provides:

> "Now, therefore, in consideration of the premises and of the mutual convenants and undertakings, herein set forth, the parties hereto have agreed, and do agree, with each other, as follows: * * *."

Paragraph 1 then provides for the discontinuance of the Delaware actions; paragraph 2 provides for a release of Universal's claims against Eastern States (theretofore assigned to Asiatic) and for the cancellation of the 1935 license agreement; paragraph 3 contains the arbitration provisions; and paragraph 4 deals with the question of patent licenses, including the sulfuric acid and polymerization licenses.

The provision with respect to the "mutual covenants and undertakings," coupled with the phrase in Eastern's

release "of other things of value, receipt whereof is hereby acknowledged," seems to justify the inference that all pending disputes were intended to be settled. This included Universal's contention with respect to Eastern States' patent infringements, which was to be submitted to arbitration. Nor was the release by Asiatic solely in consideration of Eastern States' past liabilities under the 1935 license agreement; that instrument was also cancelled. The consideration on the one side of the contract is not apportioned with respect to each of the several promises on the other side, but all considerations are inter-dependent. 3 *Willist. on Contracts*, (*Rev. Ed.*) § 860 *A; Restat. Law of Contracts*, § 266, *comment sub-section* 3; *Orenstein v. Kahn, supra.* When the parties intend a contract to be entire, it cannot be enforced in part, but must stand or fall as an entirety. *Orenstein v. Kahn, supra.* That rule governs the settlement agreement of 1940.

Nor can I agree with Eastern States' contention that its rights merely stem from the perpetration of a series of fraudulent acts by Universal and that the law relating to the rescission of fraudulent contracts is not applicable.

The precise question is one of pleading, based on the objection that Eastern States does not allege an offer to return the benefits received under the September 1, 1940 settlement agreement.

While that objection was not stressed at the first argument, perhaps it was indirectly made.

It is usually stated as a broad general rule that if a complainant, seeking the recission of a contract said to be procured by fraud, fails to allege an offer to return any benefits received under it, or an excuse for such failure, the bill will be subject to demurrer. *Black on Resc. & Cancel.*, § 672; 1 *Whitehouse Eq. Pl. & Pr.*, 178; 18 *Ency. Pl. & Pr.* 829; *Doughten v. Camden B. & L. Ass'n.*, 41 *N.J. Eq.* 556, 7 *A.* 479. Apparently that question has not been definitely decided in this State. The *Hegarty.* case, relied

on by the defendant, was before the court on final hearing; it correctly enunciated the general principles relating to the rescission of fraudulent contracts, but it is not clear that the Chancellor even intended to discuss any question of pleading. The rules of pleading applicable in actions at law, are based on very different reasons. 95 *A.L.R.* 1001; *Willist. on Contracts, (Rev. Ed.)* § 1529; *Thomas v. Beals*, 154 *Mass.* 51, 27 *N.E.* 1004. In a bill in equity to rescind a fraudulent contract, perhaps the complainant ordinarily alleges an offer to return any benefits received, but it is unnecessary to determine whether it is always essential, or whether in most cases the rights of the parties will ultimately be taken care of in any event by the entry of an appropriate conditional decree. 1 *Daniell's Ch. Pl. & Pr.*, *(6th Amer. Ed.)* 385, *note; Willist. on Contracts, supra,* § 1529; *Hawkins v. Byrn*, 150 *Tenn.* 1, 261 *S.W.* 980; *Jervis v. Berridge, L.R.* (1872-73) 8 *Ch. App.* 351.

Eastern States at least tacitly concedes the alleged general·rule of pleading, but seeks to bring itself within the well recognized exceptions heretofore considered. It claims (1) that it need not offer to abrogate the release of liability under the 1935 license agreement, or surrender the cancellation thereof, because it was procured by fraud in the first instance, and Universal, therefore, gave up nothing to which Eastern States was not entitled in equity; (2) that it need not offer to surrender the benefits of the award made under the arbitration provisions of that agreement because they were wholly for Universal's benefit; and (3) that it need not offer to return the sulfuric acid and polymerization licenses procured under that agreement because they were never used by Eastern States, nor were they of any value whatever.

I do not agree with these contentions.

In any aspect of the case, it cannot be said that the right to use the sulfuric acid and polymerization licenses appears to be valueless; whether they were ever used is unimportant.

The polymerization license agreement contains no time limit or cancellation clause (except for default, and after notice, an opportunity to cure the default), and thus confers rights upon Eastern States as long as Universal has patents in effect relating to that process. The sulfuric acid license agreement permits Universal to terminate the agreement by giving thirty days' notice in the event that the licensee does not operate under the process for two consecutive years. In the meantime, however, Eastern States can at any time, convert the agreement into a fully paid license which cannot be terminated. It, therefore, appears that Eastern acquired substantial rights under these licenses and, under the tacitly conceded general rule, must allege an offer to return them. Even if Eastern's affidavit—that these license agreements could be procured by anyone from Universal—can be regarded as a part of the amendment in controversy, at this stage that statement is unimportant.

Eastern States alleges that "the decision in the *Globe Oil & Refining Company* case, 40 *F. Supp.* 575, coupled with the decision in the arbitration proceedings, above mentioned, shows that at no time was Eastern States legally or morally liable to Universal for any royalties or for any claim based on infringement." While that allegation must be regarded as having been admitted, the admission is confined to the result of the decision in the *Globe* case and to the decision in the arbitration proceedings, provided for by the settlement agreement, and does not sustain the complainant's contention.

The two patents involved in the *Root* case were subsequently held invalid, but more than 450 other patent rights were also granted by the 1935 license agreement. The litigation settled in 1940 was for unpaid license fees on the patents involved in the *Root* case. They were released by Asiatic Petroleum Corporation as assignee, but the release covered all unpaid license fees. The 1935 license agreement was also cancelled. These benefits do not appear to be valueless and an offer to return them must be alleged.

Furthermore, the award made under the provisions of the settlement agreement cannot be relied on to show that the 450 other patents, granted by the 1935 agreement, were of no value. The arbitrators concluded that there was no infringement of Universal's patents in any of Eastern States' operations after September 1, 1940; but as rescission is relied on, the complainant must allege an offer to give up that benefit derived from the contract.

No other alleged defects need be considered.

The motion to amend is denied, and an order will be entered in accordance with this opinion.