**Stanley W. HAWKINS and Norma C.
Hawkins, Plaintiffs–Respondents,**

v.

**Robert L. FOSTER, Defendant–Appellant.**

No. 19212.

Missouri Court of Appeals,
Southern District,
Division One.

March 10, 1995.

Motion for Rehearing or Transfer,
Denied April 3, 1995.

Application to Transfer Denied
May 30, 1995.

C. Ronald Baird, Springfield, for defendant-appellant.

John Sims, Sims, Bridges, Dolence & Higdon, Neosho, for plaintiffs-respondents.

FLANIGAN, Judge.

This action arises out of a real estate contract entered into on May 9, 1990, between plaintiffs-sellers Stanley Hawkins and Norma

Hawkins, husband and wife, and defendant-buyer Robert Foster. The purchase price for the residence and lot in Neosho was $130,000, and the closing was scheduled for July 6, 1990. On that date, defendant refused to close. On June 17, 1991, plaintiffs sold the property to another purchaser for $100,000 and paid a real estate commission of $7,000 in connection with that sale. The trial court, sitting without a jury, awarded plaintiffs judgment against defendant in the sum of $37,000. Defendant appeals.

In general, defendant contends: (1) plaintiffs are not entitled to recover because they failed to provide defendant, prior to the closing, with a certificate that the residence was free of termites, and termite infestation was present; (2) even if defendant breached the contract, plaintiffs' recovery was limited to $1,000 under the liquidated damage clause of the contract; and (3) even if defendant breached the contract and the liquidated damage clause is not enforceable, plaintiffs sustained no damages because plaintiffs' evidence showed that the value of the residence on the date of closing was $149,500, which was more than the contract price.

■ On appellate review of a judgment in a nonjury action, this court must affirm the judgment unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976); Rule 73.01(c).[1]

Defendant is a licensed real estate broker who, at the time of trial, had been in the real estate business for 23 years. On May 9, 1990, aware that defendant was interested in buying the residence, plaintiff Stanley Hawkins told defendant that the house was up for sale. Later that day, defendant went to the residence and the parties signed a standard form written contract for the price of $130,000. Defendant supplied the printed form, and the parties inked in specific terms in the blanks provided. Hawkins told defendant that the residence had been "spot treated" for termites by Bob Caldwell in 1989. Defendant asked plaintiffs for a "certificate" of

that from Caldwell. Defendant inked in the following provision: "Seller to furnish termite certification."

The contract called for the $130,000 to be paid by an initial installment of $1,000, and the balance to be paid upon delivery of the deed to buyer. The contract provided that the sale would be closed at defendant's office on July 6, 1990, at 1:00 p.m.

Six days prior to the day the contract was signed, plaintiffs obtained a written appraisal of the residence from realtor Thomas Dawson, who estimated that its market value on May 3, 1990, was $149,500. On May 9, plaintiff Stanley Hawkins told defendant that Dawson had made an appraisal, but defendant did not ask to see it. On May 10, defendant asked for a copy of the Dawson appraisal, and plaintiffs gave him a copy. Much of defendant's evidence in the trial court sought to challenge the accuracy of the Dawson appraisal, but on this appeal defendant makes no claim that any inaccuracy constitutes a defense.

On June 19, prior to the scheduled closing, plaintiffs obtained from Caldwell a certificate entitled "Standard Wood Destroying Insect Report Form," received into evidence as Exhibit 5. Plaintiffs' evidence was that to obtain the certificate Caldwell "had to go through a full treatment," and they paid Caldwell $725 to do so.

On June 21, defendant called plaintiff Norma Hawkins and told her that he had a problem with the Dawson appraisal. On June 27, defendant told Mrs. Hawkins that he had a cash flow problem and would not be able to close.

On July 6, at the appointed time, plaintiffs, accompanied by their attorney, went to defendant's office for the closing. They took various documents with them, including title insurance commitments, a warranty deed, and Exhibit 5. Defendant was not there. After waiting 30 minutes, plaintiffs and their attorney left defendant's office and encountered defendant on the parking lot. Plaintiffs told defendant they were there to close, and defendant said he was not going to close. Plaintiffs' evidence was that defendant did

1. All references to rules are to Missouri Rules of Court, V.A.M.R.

not give any reason for not closing at that time.

Plaintiffs immediately listed the residence with Sy Werner, a realtor. The original listing price was $139,000. Werner testified that he made concentrated efforts to market the residence, including holding an open house for realtors only, newspaper advertising, and "everything we had available." On June 17, 1991, plaintiffs sold the residence to another purchaser for $100,000 and paid Werner a commission of $7,000.

■ Defendant's first point is that the trial court erred in awarding judgment to plaintiffs because "plaintiffs failed to provide a termite certification [to defendant] that the residence was free of termites at or prior to the scheduled closing ...; termites were present [in 1989] and had been spot treated ...; active and inactive termite infestation was present in May and June of 1990; although treatment was provided, the certification did not state that the property was free from termites, hidden defects and structural damage, and the house was warranted against termites for a period of time and thus plaintiffs failed to perform a material condition of the contract."

A sufficient answer to defendant's first point is that it is factually unsound. The contract provided: "Seller to furnish termite certification."

Stanley Hawkins testified: Caldwell would not certify any home unless he did a full treatment, so I asked him to do a full treatment. Exhibit 5 is the certificate I received from Caldwell. Defendant did not ask for Exhibit 5 at the closing or earlier. We paid Caldwell $725 for him to go through a "full treatment," and that was on June 19 and for Exhibit 5 in anticipation of the closing. When we learned that Caldwell was going to have to do treatment on the house, including drilling some holes in the parquet floor, my wife called defendant and told him that Caldwell was going to do the treatment and was going to have to drill those holes. Defendant raised no objection. I took Exhibit 5 to the closing on July 6. Exhibit 5 satisfies the requirement that we were to provide termite certification. Exhibit 5 said it was termite free. The house was free of termites at the

time we were going to turn the house over to defendant.

Plaintiffs offered the following admissions from defendant's deposition: I decided not to close because of the [Dawson] appraisal and I was never presented with anything on the termite certification. Plaintiffs told me, prior to the time I signed the contract, that there had been some termites out there and they had spot treated the year before. In my real estate business I have run into places where termites have been found. You generally go ahead and close, as long as the termites are treated and you have a certification and there is no structural damage. I don't know whether there was any structural damage at the Hawkins home. Out there at the closing I did not ask the Hawkinses for a deed or for a termite certification because I was not going to close because of the [Dawson] appraisal. [Exhibit 5] might be interpreted to be a termite certificate; a lot of lending institutions won't accept it as such; some cases it's accepted, some cases it's not.

Norma Hawkins testified: Defendant said he wanted a certification on the property for termites, and we were willing to get certification on it. We got [Caldwell] to come out and give us a certificate, Exhibit 5, and we had that document when we went to the closing. Exhibit 5 is the standard report form which we got from Caldwell. Caldwell treated it and gave me the certification. On July 6, 1990, there were no termites in the house.

Sy Werner, realtor, testified: If we had a contract calling for a termite certification, Exhibit 5 is the form I would have filled out by a termite inspector.

Exhibit 5, signed by Bob Caldwell of Caldwell Extermination Service, dated June 19, 1990, stated: "Findings: Based on careful visible inspection of the readily accessible areas of the property: (C) Visible evidence of infestation was noted; proper control measures were performed; (E) Visible evidence of previously treated infestation, which now appears inactive, was observed."

Plaintiffs' Exhibit 20, received into evidence, was a termite report on the residence

dated May 21, 1991, stating: "Property treated in 1990; no active termites observed at this time."

The findings of the trial court included the following: "The Hawkins residence was free of termites on the date of closing called for in the real estate contract. . . . In making this finding, the court relies upon the testimony of [plaintiffs] that the termites found had been treated, as well as Exhibit 5; defendant admitted that he made no inquiry as to whether the property was treated for termites, that he was not aware of any structural damage to the property caused by the termites, that he did not send anybody to the property to determine whether there was structural damage or not, and that he made no inquiry to determine whether or not the termite infestation had been treated; defendant admitted that Hawkins told him the property had been treated; defendant made no inquiry about the termite certificate; any failure of plaintiffs to provide the termite certificate when it was not requested is not a material breach of the agreement."

This court holds that the evidence justified the trial court in concluding that the plaintiffs fully performed the provision of the contract which read: "Seller to furnish termite certification." Defendant's first point has no merit.

Defendant's second point is that the trial court erred in awarding plaintiffs $37,000 because the contract of May 9 "has a liquidated damages clause that provides that: (A) Time is of the essence in this agreement, (B) that if Buyer fails to comply then the earnest money shall be paid over as liquidated damages because actual damages are difficult, if not impossible, to ascertain, and (C) said contract shall be operative at the option of Seller, but plaintiffs by selling their property and filing suit have repudiated the contract making it inoperative and limiting them to their liquidated damages."

A provision of the contract, which this opinion will call Clause A, reads:

"The price for said property shall be $130,000; to be paid by Buyer as follows: $1,000 at the time of the execution and delivery of this contract, the receipt of which is hereby acknowledged by the Sell-

er, and which is deposited with Bob Foster Escrow Acct., as agent for the Seller, as earnest money, and as a part of the purchase price and consideration for this agreement, and upon delivery of the deed as hereinafter provided, the Buyer shall pay the balance of the purchase price to Seller as follows. . . ."

Clause A was printed except for the dollar amounts and the words "Bob Foster Escrow Acct."

One of the printed provisions in the contract, which this opinion will call Clause B, reads, in pertinent part:

"It is understood and agreed that because of the commitments of the parties, that time is of the essence of this agreement, and if the Seller has kept Seller's part of this agreement by furnishing marketable title as herein provided, and the Buyer fails to comply with the requirements of this agreement within ten (10) days thereafter, then the money deposited as aforesaid shall be paid over to the Seller as liquidated damages, actual damages being difficult if not impossible to ascertain, and this agreement may or may not be thereafter operative, at the option of the Seller."

An inked in provision of the contract read: "Buyer is a Real Estate Broker. No Real Estate Commission."

Plaintiff Stanley Hawkins testified that on July 6 he asked Foster for the earnest money and that he never received it. Plaintiff Norma Hawkins testified that on July 6, during the conversation with defendant at the parking lot, the Hawkins' attorney mentioned the $1,000 earnest money. Defendant testified that he had agreed to put up an escrow amount of $1,000, that he had that escrow amount, and "it's in Bob Foster Escrow," which is defendant's account.

Clause B states that if the seller has furnished marketable title (defendant does not claim the Hawkinses did not do so) and the buyer fails to comply with the agreement within 10 days thereafter, the money deposited "shall be paid over to the Seller as liquidated damages, actual damages being difficult if not impossible to ascertain, and this

agreement may or may not be thereafter operative, at the option of the Seller."

If, as defendant testified, he placed $1,000 in his own escrow account, that was merely a matter of transferring it from his left pocket to his right. Under Clause B, the duty was on defendant, whether regarded as seller's agent or as buyer, or both, to pay the $1,000 to plaintiffs 10 days after defendant's default.

Defendant did not make payment of the $1,000 at any time, nor did he tender payment in his answer. The money was in his account. A reasonable construction of Clause B is that payment was due at the expiration of the 10–day period after the closing date. Even if there had been an agent who was entitled to a commission, and the $1,000 had been promptly paid and divided, the seller still had the option of determining whether the agreement "may or may not be thereafter operative." Payment of the deposit would not automatically spell the death of the agreement.

 Forfeitures are not favored in law or in equity. *Norman v. Durham,* 380 S.W.2d 296, 301[4] (Mo.1964); *Sebree v. Rosen,* 374 S.W.2d 132, 140[15] (Mo.1964); *Plymouth Sec. Co. v. Johnson,* 335 S.W.2d 142, 152[7] (Mo.1960). A liquidated damages provision is not enforceable as a contract unless the property forfeited is a reasonable forecast of just compensation for the harm caused by the breach, and it is difficult or impossible to estimate such harm accurately. *Norman,* at 301[7]. If the amount or value of the property stipulated as liquidated damages for breach of contract is greatly disproportionate to the ensuing loss, the court will construe it as a penalty and restrict the damages recovered to those actually suffered. *Norman,* at 301–302; *Plymouth Sec. Co.,* at 152[9].

 Labeling a provision as one of liquidated damages does not make it so if in fact it is a penalty. *Plymouth Sec. Co.,* at 152; *Wilt v. Waterfield,* 273 S.W.2d 290, 295[10] (Mo.1954); *Robert Blond Meat Co. v. Eisenberg,* 273 S.W.2d 297, 299 (Mo.1954). Generally, liquidated damages clauses are valid and enforceable, while penalty clauses are invalid. *Paragon Group, Inc. v. Ampleman,* 878 S.W.2d 878, 880[2] (Mo.App.1994); *Taos Constr. Co., Inc. v. Penzel Constr. Co., Inc.,* 750 S.W.2d 522, 525[1] (Mo.App.1988). In determining whether a clause calls for a penalty or liquidated damages, courts look to the intention of the parties as gleaned from the contract as a whole. *Yerxa, Andrews & Thurston, Inc. v. Randazzo Macaroni Mfg. Co.,* 315 Mo. 927, 288 S.W. 20, 33[10] (1926); *Muhlhauser v. Muhlhauser,* 754 S.W.2d 2, 5[6] (Mo.App.1988). See also 6 A.L.R.2d 1401 (Provision in land contract for forfeiture of payments as one for liquidated damages or penalty).

"Missouri has adopted the Restatement of Contracts rules regarding liquidated damages." *Paragon Group, Inc.,* at 881. *See also Luna v. Smith,* 861 S.W.2d 775, 779 (Mo.App.1993); *Taos Constr. Co., Inc.,* at 525–526; *Grand Bissell Towers, Inc. v. Joan Gagnon, Enter., Inc.,* 657 S.W.2d 378, 379 (Mo.App.1983); *Highland Inns Corp. v. Am. Landmark Corp.,* 650 S.W.2d 667, 674 (Mo. App.1983).

The Restatement (Second) of Contracts, § 356 (1979) reads, in pertinent part:

"(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."

Comment a. under that section includes the following:

"A term that fixes an unreasonably small amount as damages may be unenforceable as unconscionable."

Prior to the signing of the contract on May 9, 1990, plaintiff Stanley Hawkins had lost his job in Neosho and was working in Nebraska. He came home every other weekend to visit his family. He later made arrangements to purchase a home in Nebraska. Plaintiffs argue that $1,000 in liquidated damages is unreasonable as a forecast of probable damages and disproportionate to the amount of damages which would probably result from defendant's breach and that the provision is unconscionable. That argument, under the

record here, is valid, and there is a more basic reason why defendant is not entitled to rely on Clause B to limit plaintiffs' recovery to $1,000.

■ "A party cannot affirm a contract in part, and repudiate it in part. He cannot accept its benefits on the one hand, while he shirks its disadvantages on the other. He cannot play fast and loose in the matter." *Schurtz v. Cushing,* 347 Mo. 113, 146 S.W.2d 591, 594[4] (1940). "A party will not be allowed to assume the inconsistent position of affirming a contract in part by accepting or claiming its benefits, and disaffirming it in part by repudiating or avoiding its obligations or burdens." *In re Marriage of Carter,* 862 S.W.2d 461, 468[5] (Mo.App.1993). "A party to a contract cannot claim its benefits where he is the first to violate it." *Motor Port, Inc. v. Freeman,* 62 S.W.2d 479, 481[3] (Mo.App.1933). A party to a contract cannot have the benefit of its provisions which are favorable to him and ignore its conditions which are to be performed by him. *Farmers & Merchants Bank of Eureka v. Boland,* 175 S.W.2d 939, 947[9] (Mo.App.1943). *See also Artcraft Cabinet, Inc. v. Watajo, Inc.,* 540 S.W.2d 918, 926[16] (Mo.App.1976).

■ Clause B required defendant, upon defendant's breach, to pay plaintiffs the $1,000 deposit. Defendant did not do so. To say that defendant breached that duty merely in his capacity as seller's agent and not as buyer is, under the facts here, to place form over substance. Defendant's breach of Clause B prevents him from relying upon it as a limit to plaintiffs' recovery.

Defendant's reliance on *Warstler v. Cibrian,* 859 S.W.2d 162 (Mo.App.1993), is not justified. In *Warstler* the liquidated damages provision called for payment of the deposit to seller, upon the buyer's breach, "in the event the seller shall declare the contract inoperative." Clause B, in the case at bar, does not contain the quoted language. Defendant's second point has no merit.

Defendant's third point is that the plaintiffs failed to make a submissible case on the issue of damages, in that "all evidence offered by plaintiffs" was to the effect that the value of the residence and lot on the date of closing was $149,500, which was more than the contract price, and the measure of damages is the difference between the contract price and the value of the property on the date the contract was breached.

In answer to a request by defendant for findings of fact and conclusions of law, the trial court made the following findings:

"The court finds the amount of damages suffered by plaintiffs as a result of the breach of contract as to loss of the benefit or loss of bargain amounts to $37,000 and the court calculates those damages as follows and relies on the following testimony: The Contract of Sale between plaintiffs and defendant called for a sale price of $130,000, with no real estate commission. Plaintiffs sold this property on June 17, 1991, for $100,000 less a real estate commission of $7,000. There is no evidence that Hawkins could have sold the property for more or could have made any other sales. Foster admits in his deposition and in his testimony the fair market value must have been $100,000. Tom Dawson stated the fair market value for residential use was $100,000. Both Foster and Dawson admitted residential was the highest and best use. Sy Werner testified he sold the house for as much as he could get. Stan Hawkins testified he sold the house for as much as he could. Several testified there was no change in the real estate from the date called for closing of the Foster contract and when the Hawkins sold their property for $100,000."

Defendant has not challenged the foregoing findings.

Long ago our supreme court said:

"That a vendor of land, on failure of a purchaser to pay, may re-sell and recover damages for the breach of the first contract, is well settled; and, although the difference in price between the first and second sales is not conclusive, yet, according to the authorities, it affords a good criterion of the damages actually sustained." *Gardner v. Armstrong,* 31 Mo. 535, 540–541 (1862).

"In an action for breach of contract brought by the seller of real estate against the buyer, the general rule is that the seller's measure of damages is the difference between the contract price and the market

value of the land on the date the contract 'should have been completed,' that is the date of breach." *Conway v. Judd,* 723 S.W.2d 905, 909[3] (Mo.App.1987).

"In sales of an interest in realty, there is no obligation on the part of the seller to elect his remedy when the buyer defaults and there is no applicable theory of mitigation of damages. The seller may resell the property or retain it and, in either event, be entitled to recover his loss measured by the difference between the contract price and the market price. Of course, an essential element of the seller's case is proof of market value and if he does resell within a reasonable time after the breach, the price obtained is some evidence of market value." *Leonard v. Am. Walnut Co., Inc.,* 609 S.W.2d 452, 455[6] (Mo.App.1980).

▆▆▆ Conflicts in the evidence concerning real estate values are for resolution by the fact finder. *State v. Salmark Home Builders, Inc.,* 375 S.W.2d 92, 100[14] (Mo. 1964); *Earney v. Clay,* 516 S.W.2d 59, 65–66[13] (Mo.App.1974). The fact finder, in this case the trial court, need not make his finding "precisely coincide" with the testimony of any particular expert. *State ex rel. State Highway Comm'n v. Grissom,* 439 S.W.2d 13, 15–16 (Mo.App.1969). It is sufficient if the value set by the fact finder is "within the range" of the evidence. *Id.* at 17. To similar effect see *City of Lee's Summit v. Hinck,* 618 S.W.2d 719, 721 (Mo.App.1981).

▆▆▆ It is true that on cross-examination by defendant's counsel both plaintiffs testified that in their opinion the fair market value of the residence on the day of closing and on the day of the resale was $149,500.

"Although it has been stated that a party's testimony 'may be of such a nature as to have the effect of a judicial admission,' which precludes the party from disputing it unless some reasonable explanation for the falsity of the statement is given, this principle only applies to positive statements of fact and not to mere estimates or opinions. *Jockel v. Robinson,* 484 S.W.2d 227, 231 (Mo.1972)." *Heilman v. Heilman,* 700 S.W.2d 843, 844[2] (Mo.banc 1985).

Similarly, in *Hecker v. Schwartz,* 426 S.W.2d 22 (Mo.1968), the court said, at 25: "Where, however, the testimony of a party is not a positive statement of fact within his own knowledge, but is a mere estimate or opinion, it does not have the effect of a judicial admission."

This court holds that plaintiffs' testimony, extracted on cross-examination and consisting of their opinions as to the market value of the residence, did not have the effect of judicial admissions. The trial court's award of $37,000 was supported by the evidence. *See Hoelscher v. Schenewerk,* 804 S.W.2d 828, 832[4] (Mo.App.1991).

The judgment is affirmed.

SHRUM, C.J., and MONTGOMERY, J., concur.