**CRABBY'S, INC., Plaintiff–Respondent,**

v.

**James T. HAMILTON, and Paragon Ventures, L.L.C., Defendants–Appellants.**

**No. 28591.**

Missouri Court of Appeals, Southern District.

Jan. 28, 2008.

---

Ron Mitchell and Brent Correll, of Blanchard, Robertson, Mitchell & Carter, P.C., of Joplin, MO, for appellants.

Abe R. Paul, The Paul Law Firm, of Pineville, MO, for respondent.

GARY W. LYNCH, Chief Judge.

Buyers under a contract for sale of real estate appeal the trial court's judgment awarding Seller damages due to Buyers' breach of that contract. We affirm.

### Standard of Review

This case was tried before the court without a jury. The standard of review in a court-tried case is set out in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Harrison v. DeHeus*, 230 S.W.3d 68, 74 (Mo.App.2007). The judgment will be affirmed unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law. *Id.* "We accept as true the evidence and reasonable inferences therefrom in favor of the prevailing party and disregard the contrary evidence." *Id.*

### Factual and Procedural Background

Fred and Carolyn Billingsly are the shareholders of a Missouri corporation called Crabby's, Inc. ("Seller"), which owned and operated Crabby's restaurant in Joplin, Missouri, for several years. In 2003, Seller listed the restaurant and ac-

companying real property with Dee Kassab of Pro 100 Realty. The original listing price was $325,000, and Seller rejected an initial purchase offer for $275,000. James Hamilton, through his real estate agent Kent Eastman of Pro 100 Realty,[1] then offered to purchase the property for $290,000, and this offer was accepted on May 17, 2003. Hamilton thereafter assigned his interest in the contract to Paragon Ventures, L.L.C. ("Paragon"), a business that Hamilton and Richard Worley set up to operate a restaurant. Hamilton also remained as an individual buyer on the contract. Hamilton and Paragon are hereinafter referred to collectively as "Buyers."

The contract contained the following financing contingency provision:

> This contract is contingent on Buyer's [sic] ability to obtain a conventional loan or loans in the amount of $232,000, payable over a period of not less than 15 years and bearing interest at a rate of not more than 5.5% per annum. Seller shall not be obligated to pay any of the expenses incidental to the obtaining of such loan or loans. Buyer shall use reasonable diligence in seeking to obtain such loan or loans, and if Buyer does not furnish seller with a copy of an effective written loan commitment within 30 days from the Effective Date, then this Contract shall automatically terminate and the Earnest Money shall be returned to Buyer.

Buyers never furnished Seller with a copy of an effective written loan commitment within 30 days of the effective date of the contract.

After entering into the contract on May 17, 2003, Buyers made arrangements for financing at the Bank of Joplin. Buyers applied for and were approved by the bank for a loan in the amount of $340,000.00. The bank agreed to loan them $225,000.00 amortized over fifteen years on the real estate, $65,000.00 amortized over seven years on the equipment, and a $50,000.00 revolving line of credit all at the rate of interest of prime plus 1.5%. Buyers did not apply for a loan with any other financial institution.

On June 10, 2003, Buyers' real estate agent was furnished a title insurance commitment from Jasper County Title showing sales tax liens attached to the property.

The contract originally specified a June 30, 2003 closing date. Following an inspection of the property, certain repairs were made, and an appraisal was performed as a requirement of the financing by Bank of Joplin. As a result of some appraisal requirements, the parties, on a date not disclosed by the record, entered into an agreement extending the closing date to July 14, 2003. Following this extension, the parties discussed other additional repairs and this led to an agreement whereby Buyers would receive a credit of $1,373.54 against the purchase price in lieu of additional repairs being made.

By a second extension agreement dated July 18, 2003, the closing date was again extended, this time to August 1, 2003. On that same date the parties also entered into an agreement that allowed Buyers to take possession of the property prior to closing so that they could start cleaning it. Also around this same time period, Buyers made application for appropriate licenses to operate a restaurant on the property and had the utilities for the property transferred into Buyers' name.

---

1. The contract discloses that Pro 100 Realty served as the Dual Agent of Seller and Buyers.

Nothing in any of the subsequent agreements entered into between the parties altered any of the terms of the financing contingency contained in the original contract.

Immediately prior to July 30, 2003, all documentation was in place at the title company and ready for closing on August 1, 2003. Financing was in place from the Bank of Joplin. All parties were ready to close. The tax liens, mentioned in the title commitment provided to Buyers, were satisfied on the morning of August 1, as contemplated by the July 18 extension agreement between the parties, and Sellers obtained a certificate of "No Sales Tax Due" from the state. U.S. Bank (Seller's lender) had agreed to accept $266,000.00 to apply on Sellers' indebtedness and release its lien on the property. According to the closing statement prepared by the realtor, after payment of mortgages, real estate taxes, and liens, Seller was to receive a cash balance of $1,757.72 when the transaction closed.

On July 30, 2003, Buyers sent a letter to the realtor and Seller stating their intention not to close the transaction. In this letter, Buyers claimed "items, which we consider fixtures, have been taken from the premises." This missing property consisted of two used televisions, a couple of mirrors, a set of stereo speakers, and a computerized cash register. These items were not part of the list of personal property that was to be transferred in the sale, which was itemized and attached to the contract. This letter also specified the existence of the tax liens as an additional reason for Buyers' refusal to close the transaction as scheduled. Buyers made no mention of any inability to obtain satisfactory financing. Buyers failed to appear for closing as scheduled on August 1, 2003.

On August 5, 2003, Paragon offered to buy a building at 520 Main Street in Joplin, Missouri, for the purpose of establishing a restaurant. This offer was accepted by those sellers on August 6, 2003 and closed September 22, 2003. The purchase price for that property was $170,000.00.

After Buyers refused to close the sale with Seller on August 1, 2003, Seller's realtor continuously tried to sell the property. However, no offers were received until May of 2004, when J and A Café of Kansas, L.L.C., offered to purchase the property for $235,000.00. Sellers accepted this offer, and the transaction closed on July 15, 2004.

Seller thereafter filed suit against Buyers for breach of contract. As part of its damages, Seller claimed the difference in sales price between Buyers' $290,000 contract price which should have closed on August 1, 2003, and the $235,000 price actually obtained when the property subsequently sold eleven and one-half months later on July 15, 2004. Seller also claimed real estate and personal property taxes, utilities, and mortgage interest accruing during that period as damages.

The trial court entered judgment in favor of Seller and against Buyers in the total amount of $95,547.30. Buyers timely appeal this judgment.

Additional facts will hereinafter be disclosed as needed to appropriately discuss Buyers' points relied on.

### *Discussion*

### *Buyers Waived the Financing Contingency*

Buyers' first point claims that the trial court erred in finding they breached the contract, "because the contract terminated pursuant to its own financing contingency provision when [Buyers] could not obtain financing." Buyers initially argue that as a matter of law they could not have breached the contract by refusing to close

on August 1, 2003, because by its explicit terms the contract automatically terminated when Buyers did not "furnish Seller with a copy of an effective written loan commitment," as required by the financing contingency provision in the contract. Buyers alternatively argue that "if the trial court's judgment rests on an implicit finding that the contract had not automatically terminated under the financing contingency provision, then the trial court erred in interpreting the term 'reasonable diligence' and finding that the defendants had not used such diligence in finding a loan." Seller counters Buyers' point, contending that Buyers, by their conduct after entering into the contract, waived the financing contingency provisions in the contract.

■■■ "A provision in a real estate contract that makes the contract contingent upon the buyer's obtaining financing is a condition." *Howard v. Youngman,* 81 S.W.3d 101, 110 (Mo.App.2002). Because such conditions are meant to protect the buyer, they are a condition of the buyer's duty, but not a condition of the seller's duty under the contract. *Id.* "[I]n a real estate contract containing a contingency clause, upon the nonoccurrence of the condition (i.e., the buyers obtaining financing), the buyer is *ipso facto* excused from performance." *Id.* However, "the buyer can elect to waive the contingency and proceed with the contract under the rule that a party may waive any condition of a contract in that party's favor." *Id.*

■■ "Parties to an agreement may by their oral agreement or their conduct waive the provisions of a contract between them. This doctrine applies equally to provisions requiring written communications." *Pilla v. Estate of Pilla,* 689 S.W.2d 727, 730 (Mo.App.1985).

Waiver of rights under a contract has been defined as follows:

"Waiver" has been defined as an intentional relinquishment of a known right, on the question of which intention of the party charged with waiver is controlling and, if not shown by express declarations but implied by conduct, there must be a clear, unequivocal, and decisive act of party showing such purpose, and so consistent with intention to waive that no other reasonable explanation is possible.

*Keltner v. Sowell,* 926 S.W.2d 528, 531 (Mo.App.1996) (quoting from *Carroll's Warehouse Paint Stores, Inc. v. Rainbow Paint & Coatings, Inc.,* 824 S.W.2d 147, 151–52 (Mo.App.1992) (quoting from *Bartleman v. Humphrey,* 441 S.W.2d 335, 343 (Mo.1969))).

The contract in the instant case defines its Effective Date as "the date and time of final acceptance on the signature page." Seller finally accepted the contract by signing the signature page on May 17, 2003. Thus, the effective date of the contract was May 17, 2003. The financing contingency in paragraph five of the contract provided: "if Buyer does not furnish Seller with a copy of an effective written loan commitment within 30 days from the Effective Date, then this Contract shall automatically terminate and the Earnest Money shall be returned to Buyer." This thirty-day time period expired on June 16, 2003. The evidence is undisputed that Buyers did not furnish Seller with a copy of an effective written loan commitment within this time period. Therefore, by its explicit terms, the contract "automatically terminated" on June 16, 2003. *See L & K Realty Co. v. R.W. Farmer Constr. Co.,* 633 S.W.2d 274, 277–78 (Mo.App.1982). Yet, Buyers' actions after that date were inconsistent with such a termination.

On July 17, 2003, a month after the contract supposedly automatically termi-

nated, Buyers executed a written amendment to the contract extending the closing date from July 14, 2003 to August 1, 2003.[2] This amendment additionally provided for the assignment of the contract to Paragon as a buyer in addition to Hamilton and for a $1,373.54 credit against the purchase price in exchange for Buyers releasing Seller from any obligation to perform any further repairs to the property. Finally this amendment provided: **"IT IS UNDERSTOOD BY ALL PARTIES THAT ALL OTHER TERMS AND CONDITIONS OF THE CONTRACT REMAIN UNCHANGED."** Buyers entered into this amendment with the intention of closing the contract on August 1, 2003.

Also on July 17, 2003, Buyers executed an "Agreement for Possession Prior to Closing—Contract Rider," which granted them the right to take possession of the property as a tenant on July 21, 2003. This agreement provided that "this Rider shall become a part of the Contract" and "[p]ossession is for the sole purpose of cleaning only." To effectuate their possession, Buyers accepted a key to the property from Seller. During this time period, Buyers had the utilities to the property switched over and put in their name. Also during this time, and as late as July 25, 2003, Buyers were in the process of securing appropriate licenses to operate their restaurant on the property after closing.

Nothing in either the amendment or the agreement for possession purported to modify or extend any of the provisions of the financing contingency in the contract. Thus, by the specific provision of the amendment, in bold and all capital letters, the financing contingency **"REMAINED UNCHANGED."** Furthermore, Buyers' real estate agent, Kent Eastman, testified

that if the parties had extended the financing contingency, it should have been accomplished through a written amendment to the contract. Because the time period for Buyers to "furnish Seller with a copy of an effective written loan commitment" contained in the financing contingency had already expired as of July 17, 2003, and the amendment and agreement for possession signed by Buyers on that date did not otherwise extend that time period, the only reasonable explanation possible for and consistent with Buyers' signatures on these documents is their waiver of this contract requirement and the resulting automatic termination of the contract. *See Keltner,* 926 S.W.2d at 531.

Nevertheless, Buyers argue that, regardless of their waiver of the automatic termination provision in the financing contingency, their inability to obtain financing on the terms otherwise set forth in the financing contingency relieved them of their obligations under the contract. However, Seller counters that Buyers' conduct evidenced a clear and unequivocal intention to waive all of the financing terms in the financing contingency.

Initially, there is no evidence in the record that Buyers ever made any application for a loan "in the amount of $232,000, payable over a period of not less than 15 years and bearing interest at a rate of not more than 5.5% per annum," as provided in the financing contingency. Chris Crouch, the loan officer at Bank of Joplin testified that Buyers applied for a loan in the amount of $340,000.00. Other than this one application, Buyers did not apply for any other loans. Failing to seek a loan on the terms set forth in the financing contingency evidences Buyers' failure to use reasonable diligence to obtain such

---

**2.** The parties had previously amended the contract to extend the original closing date of June 30, 2003, to July 14, 2003, however, the record does not disclose whether this amendment was executed before or after June 16, 2003.

financing as required by the contingency. *Goldberg v. Charlie's Chevrolet, Inc.*, 672 S.W.2d 177, 179 (Mo.App.1984). We need not address that issue, however, because such action, coupled with Buyers' conduct on July 17, 2003, and thereafter, also evidences Buyers' waiver of the entire financing contingency.

As of July 17, 2003, Buyers' application for a loan in the amount of $340,000.00 to finance the purchase of the property and operate their new restaurant had been approved by the Bank of Joplin, loan documentation was being prepared and the bank, according to Crouch, was on a "countdown to closing." Although the bank never gave Buyers formal written notification of its approval of their loan application, Buyers were proceeding during the time period of July 2003, upon the assumption that the loan had in fact been approved, which it had been, and were working toward the end of closing the transaction with proceeds from that loan.

Thus, on July 17, 2003, Buyers: (1) had never applied for financing on the exact terms set forth in the financing contingency; (2) had secured and been approved for financing on terms that were acceptable to them even in the absence of a written loan commitment; (3) executed an amendment to the contract extending the closing date of the contract without any extension of the financing contingency and without providing a written loan commitment within the time period called for by the financing contingency; (4) executed an agreement to take possession of the property prior to closing; (5) accepted and used a key to effectuate that possession, and, thereafter (6) proceeded to have the utilities to the property transferred to them and to secure appropriate licensing to operate a restaurant on the property. Between July 17, 2003 and July 30, 2003, the record is void of any evidence that the approval of

Buyers' financing with the Bank of Joplin had been withdrawn or that the bank was taking any action other than proceeding to closing as intended by Buyers. Buyers' written notice to Seller on July 30, 2003, indicating they were not going to close the transaction, contained no mention of Buyers' inability to obtain financing as provided in the financing contingency.

All of these actions by Buyers are clear, unequivocal, and decisive acts showing Buyers' intentional relinquishment of the benefit of the entire financing contingency, and are so consistent with the intention to waive that contingency that no other reasonable explanation is possible. *See Keltner*, 926 S.W.2d at 531. Finding that the record supports a determination by the trial court that Buyers waived the financing contingency, we need not address Buyers' argument regarding whether the trial court erred in interpreting the term "reasonable diligence" contained in the financing contingency or whether Buyers used reasonable diligence to obtain financing. Point I is denied.

### The Trial Court's Determination of Fair Market Value is Supported by Substantial Evidence

The Buyers' second point claims that the trial court's judgment is not supported by substantial evidence of the fair market value of the property as of the date the contract was breached by the Buyers—August 1, 2003—in that Seller did not offer any direct evidence of the fair market value of the property on that date. Buyers contend that the actual sale price of $235,000.00 received by Seller on July 15, 2004, is not substantial evidence of the fair market value of the property on August 1, 2003 for two reasons: first, being eleven and one-half months after the relevant date, it is too remote in time; and, second, it was the product of a distress sale in that

the Seller was compelled to sell the property in that transaction. We disagree with both contentions.

 A seller's measure of damages for a buyer's breach of a contract for the sale of land with a structure on it is the difference between the purchase price and the fair market value of the property on the date of breach. *Wooten v. DeMean*, 788 S.W.2d 522, 527–28 (Mo.App.1990). That is, the measure of damages is the difference between the contract price and the fair market value of the property on the date the sale should have been completed. *Leonard v. American Walnut Co., Inc.*, 609 S.W.2d 452, 455 (Mo.App.1980). "An essential element of the seller's case is proof of market value, and if he does resell within a reasonable time after the breach, the price obtained is some evidence of market value." *Id.* Conflicts in the evidence concerning real estate values are for resolution by the fact finder. *State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc.*, 375 S.W.2d 92, 100 (Mo.1964). It is sufficient if the value set by the fact finder is "within the range" of the evidence. *City of Lee's Summit v. Hinck*, 618 S.W.2d 719, 721 (Mo.App.1981).

While Buyers acknowledge that the sale price received by a seller from a subsequent sale of the property is substantial evidence to support a trial court's determination of the fair market value of a property as of the date of the breach if the subsequent sale occurs within a reasonable time after the date of the breach, they claim that a sale eleven and one-half months after the breach, as occurred in this case, is not within a reasonable period of time as a matter of law. Buyers cite no Missouri cases supporting their contention. They cite only *Chris v. Epstein*, 113 N.C.App. 751, 440 S.E.2d 581 (1994), for the proposition that a resale of realty that occurred an entire year after the contract breach was not only not representative of fair market value a year earlier, but irrelevant.

Seller points us to *Hawkins v. Foster*, 897 S.W.2d 80 (Mo.App.1995), where we held that the price obtained in a subsequent sale which occurred a little over eleven and one-half months after the date of the buyer's breach of a real estate contract supported an award of damages in favor of the seller based upon the fair market value of the property. Buyers have failed to distinguish how the time period approved by us in *Hawkins* materially differs from the essentially same time period in the instant case. Thus, Buyers have not convinced us that we should depart from our holding in *Hawkins*. Based upon that holding, the subsequent sale by Seller in the case at bar on July 15, 2004, occurred within a reasonable time after the date of Buyers' breach of the contract, such that it provided substantial evidence to support the trial court's determination of the fair market value of the property on the date of Buyer's breach of the contract. *See also Hoelscher v. Schenewerk*, 804 S.W.2d 828 (Mo.App.1991) (subsequent sale approximately nine months after date of breach).

Buyers next contend that the subsequent sale price received by Seller is not substantial evidence of the fair market value of the property as of the date of the breach because the subsequent sale was a distress sale in that Seller was "compelled" to sell the property. Buyers claim that because fair market value is defined as "the price which property will bring when it is offered for sale by an owner who is willing but *under no* compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so[,]" *Turner v. Shalberg*, 70 S.W.3d 653, 659 (Mo.App.2002) (quoting *Carter v. Matthey Laundry & Dry Cleaning Co.*,

350 S.W.2d 786, 794 (Mo.1961)) (emphasis added), and because Seller was compelled to sell the property, then the sale price could not, by definition, reflect the fair market value of the property. The flaw in Buyers' argument is that the evidence they cite in support of their claim does not exist.

Buyers direct us to the testimony of Carolyn Billingsly, one of Seller's owners, to support their contention. Buyers' trial counsel asked Billingsly: "And so, you were compelled to sell it, I mean, you wanted to sell it bad; true?" She responded: "We did." Counsel's question was a compound question—"you were compelled to sell it" and "you wanted to sell it bad." The wording of her response—"We did"—corresponded to the latter question and not the former. If she had been responding to the first question, her answer would have been in the form "We were." Thus, while Billingsly's testimony supports that Seller wanted badly to sell the property at the time of the subsequent sale, it does not support that Seller was compelled to do so.

Buyers fail to cite to any authority for the proposition that a sale in which the seller is highly motivated or badly wants to sell, as opposed to being compelled to sell, eliminates that sale from being considered as a fair market value sale of the property. Their reliance on *Carter*, 350 S.W.2d 786, is misplaced. In *Carter*, the sale was made pursuant to a plan of liquidation which had to be completed within a one-year period under a provision of the tax code, and, in addition, the property was under the threat of condemnation which would have compelled a forced sale. *Id.* at 794. While Seller here was financially motivated to sell and was highly desirous of selling the property at the time of the subsequent sale, it was not compelled to sell as was the seller in *Carter*.

Point II is denied.

### *Decision*

The trial court's judgment is affirmed.

BARNEY, P.J., and BARNES, SR., J., concur.