**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| JOHN MERRILL LAFFERTY, JR.,<br><br>Plaintiff,<br><br>v.<br><br>CORIENT PARTNERS, LLC, CORIENT SERVICES LLC, and SEGALL BRYANT & HAMILL, LLC,<br><br>Defendants. | C.A. No. 2026-0004-LWW |

**MEMORANDUM OPINION**

Date Submitted: February 2, 2026
Date Decided: March 2, 2026

David E. Wilks, D. Charles Vavala III, WILKS LAW, LLC, Wilmington, Delaware; Jeffrey S. Boxer, CARTER LEDYARD & MILBURN LLP, New York, New York; *Attorneys for Plaintiff John Merrill Lafferty, Jr.*

Michael A. Barlow, Gates H. Young, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Samuel G. Williamson, Shalia M. Sakona, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Miami, Florida; Rachel E. Epstein, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Defendants Corient Partners LLC, Corient Services LLC, and Segall Bryant & Hamill LLC*

**WILL, Vice Chancellor**

The plaintiff in this action seeks to permanently enjoin an arbitration launched by his former employer. He argues that the arbitration clause appears in an improperly amended agreement he never agreed to. In his view, the parties' dispute is governed by a prior version of the agreement, which lacks an arbitration clause and mandates litigation in Delaware.

The evidence presented at an expedited trial shows otherwise. The plaintiff manifested his assent to the amended agreement when he signed an equity award that incorporated its terms. He then accepted the amended agreement's economic benefits for nearly a year before resigning. Having done so, he is bound by the agreement, including its arbitration clause. Judgment is for the defendants; the request for an injunction is denied.

## I. BACKGROUND

The following facts were proven by a preponderance of the evidence at a trial on a paper record.[1]

---

[1] Trial was presented on an expedited basis and on a paper record. Dkt. 37. The trial transcript is cited as "Trial Tr." Dkt. 39.

### A.     Lafferty and Corient

Plaintiff John Merrill Lafferty, Jr. is a wealth manager and investment adviser. In 2004, he joined Segall Bryant & Hamill, LLC, a Chicago-based investment firm, as a portfolio manager.[2]  He was later promoted to senior portfolio manager.[3]

In April 2021, Segall Bryant & Hamill was acquired by an affiliate of Corient Partners LLC and Corient Services LLC (together, "Corient"), a global wealth and asset management firm.[4]  Lafferty received significant proceeds in connection with the transaction.[5]

In mid-2023, Lafferty was invited to become a Class B member of Corient Partners.[6]  As a result, the structure of his compensation would change from a fee-based model to a base salary plus quarterly distributions.[7]

On August 15, 2023, Lafferty executed a Joinder Agreement to the Fourth Amended & Restated Limited Liability Company Agreement of Corient Partners

---

[2] Verified Pet. to Enjoin Arbitration (Dkt. 1) ("Pet.") ¶ 11.

[3] Unsworn Transmittal Decl. of Gates H. Young in Supp. of Resp'ts' Answering Br. in Opp'n to Mots. for Expedited Proceedings and for TRO (Dkt. 3) ("Young Decl.") Ex. 6 (Decl. of Kurt MacAlpine in Supp. of Corient P'rs' Emergency Mot. for TRO and Prelim. Inj.) ("MacAlpine Decl.") ¶ 25.

[4] MacAlpine Decl. ¶¶ 15-16.

[5] *Id.*

[6] *Id.* ¶ 26.

[7] *Id.* at Ex. 6; Reply Br. in Supp. of Pet'r's Mot. for Expedited Proceedings and for TRO (Dkt. 16) Ex. A (Decl. of Resp. John Merrill Lafferty, Jr.) ("Lafferty Decl.") ¶¶ 20-22.

LLC (the "Fourth LLC Agreement").[8] In doing so, he agreed to be bound by the Fourth LLC Agreement "as the same may be amended from time to time."[9]

The Fourth LLC Agreement contained a Delaware forum selection clause. Under Section 13.19 of the Fourth LLC Agreement, Lafferty submitted to the "exclusive jurisdiction of any state or U.S. federal court sitting in [Delaware] . . . with respect to any claim or cause of action" that might "aris[e] under or relat[e] to th[e] Agreement."[10]

### B. The Fifth LLC Agreement

Under Section 10.01 of the Fourth LLC Agreement, the "CI Member" had the authority to unilaterally modify or amend the agreement.[11] That right was subject to a limitation. The agreement could not be amended "in any manner that would materially, adversely, and disproportionately affect any Member, or class of Members, without the consent of such Member, or a Majority in Interest of such class[.]"[12]

---

[8] *See* Pet. Ex. A ("Fourth LLC Agreement"); *see also* Pet. Ex. B. ("Joinder Agreement").

[9] MacAlpine Decl. Ex. 7 § 2.

[10] Fourth LLC Agreement § 13.19.

[11] *Id.* § 10.01 (explaining that the Fourth LLC Agreement "may be modified, amended, or waived from time to time as determined by the CI Member"); *id.* at Ex. A, Definitions (defining "CI Member" initially as "CIPW Topco" or its "Permitted Transferee"). A "Permitted Transferee" included "with respect to the CI Member, (i) an Affiliate thereof and (ii) the direct or indirect equityholders, members, partners, or employees of the CI Member or Affiliate." *Id.*

[12] *Id.* § 10.01.

3

Through a series of corporate transactions in 2023, Corient Management LLC became the CI Member of Corient Partners.[13] On February 7, 2024, Corient Management exercised its authority under Section 10.01 to enact the Fifth Amended & Restated Limited Liability Company Agreement (the "Fifth LLC Agreement").[14]

The Fifth LLC Agreement fundamentally changed the company's dispute resolution framework. It eliminated Section 13.19 of the Fourth LLC Agreement, which had provided for exclusive jurisdiction in Delaware courts, and replaced it with an arbitration provision.[15] The revised provision—now Section 14.02—read:

> Any action, suit, or other legal proceeding arising out of or relating to this Agreement (including the enforcement of any provision of this Agreement) or the legal relationship of the parties hereto (whether at law or in equity, whether in contract or in tort, or otherwise) shall be submitted to final and binding arbitration. Such arbitration shall be conducted before a neutral arbitrator in accordance with the JAMS Comprehensive Arbitration Rules & Procedures (including any subsequent modifications or amendments thereto, the "JAMS Rules"), as the exclusive remedy for such controversy, claim or dispute, and shall be located in New York, New York or Miami, Florida.[16]

---

[13] Unsworn Decl. of Scott Akins in Supp. of Resp'ts' Trial Br. (Dkt. 31) ("Akins Decl.") ¶¶ 3, 5-6.

[14] *See* Young Decl. Ex. 2 (Fifth Amended & Restated Limited Liability Company Agreement of Corient Partners LLC) ("Fifth LLC Agreement"); Akins Decl. ¶ 6.

[15] *Compare* Fourth LLC Agreement § 13.19, *with* Fifth LLC Agreement § 14.02.

[16] Fifth LLC Agreement § 14.02(a).

Section 14.02 permitted parties to "conduct discovery to the same extent as would be permitted in a court of law[,]" and "irrevocably" waived their rights to a jury trial.[17]

### C. Notification of the Amendment

On February 28, 2024, Corient's Senior Vice President and General Counsel, Scott Akins, emailed Corient Partners' members.[18] He explained that changes had been made to the Fourth LLC Agreement to "better reflect the way the partnership operates in practice."[19] He assured the members that "none of the changes to the agreement materially, adversely, and disproportionately affect any partner or the individual partners."[20] He also told them to "be on the lookout for a system generated [] email notification[,]" which would grant them access to a virtual portal (Carta) containing the Fifth LLC Agreement.[21]

The Fifth LLC Agreement was uploaded to Carta on February 29.[22] Five days later, on March 4, a Corient paralegal emailed Lafferty and the other members to

---

[17] *Id.* §§ 14.02(b)-(c).

[18] Young Decl. Ex. 5 (Decl. of Jennifer Nuñez in Supp. of Suppl. Mem. Concerning Arbitrability) ("Nuñez Decl.") Ex. 1.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶¶ 3-5.

announce that the Fifth Amended LLC Agreement was available on Carta for review.[23]

### D. Execution of the Equity Award Agreement

On August 1, 2024, Corient issued a Notice of Conversion to all Class B units holders.[24] The notice stated that the holders' Class B units had been converted to Class A units. It also explained that future distributions would be tied to the Fifth LLC Agreement:

> [A]ll unvested Class A Units shall remain eligible for distributions of the Company in accordance with the terms of that certain Fifth Amended and Restated Limited Liability Company Agreement of the Company . . . .[25]

To accept the Class A units, holders had to sign an Equity Award Agreement.[26] It stated that acceptance of the Class A units was "subject to all of the terms and conditions" in several documents "incorporated . . . in their entirety" into the Equity Award Agreement.[27] The Notice of Conversion was among the incorporated documents.[28]

---

[23] *Id.* at Exs. 2-4.

[24] *Id.* at Ex. 6.

[25] *Id.*

[26] *Id.* at Ex. 5.

[27] *Id.*; *see infra* note 75 (quoting the Equity Award Agreement).

[28] Nuñez Decl. Ex. 5.

Lafferty accessed the Equity Award Agreement via Carta and signed it electronically on January 15, 2025.[29] He also checked a box affirming: "I have read and understand the Corient . . . Notice of Conversion," which was linked for his review.[30] He agreed that his signature would "be applied to the Documents, as applicable" and that the "Documents" formed part of the "entire understanding between [Lafferty] and [Corient Partners] . . . and supersede[d] all prior agreements, promises, and/or representations on that subject."[31]

### E.    Acceptance of Benefits

Upon the conversion, Lafferty's profits interests became capital interests with downside protection. In the first quarter of 2025, he received a grant of 238 units according to the Fifth LLC Agreement.[32] Throughout the year, he also received three quarterly distributions totaling $258,195.[33] Lafferty accepted these units and distributions without objection.[34]

---

[29] *Id.*

[30] *Id.*

[31] *Id.* The "Documents" included the Notice of Conversion. *Id.*

[32] *Id.* at Ex. 7.

[33] *Id.* at Exs. 7, 8.

[34] *Id.* at Ex. 3.

## F. Resignation and Arbitration

In late 2025, Lafferty contemplated leaving Corient. On December 12, 2025, he resigned, citing differing advisory philosophies.[35] He immediately registered as an investment adviser with William Blair, a competing Chicago-based investment management company.[36]

By the time he resigned, Lafferty had received over $7 million in value from Corient Partners.[37] This consisted of 124,676 vested units worth $2,133,206, 249,590 units subject to time-based vesting worth $4,270,484, and cash distributions totaling $861,556.60.[38]

On December 29, 2025, Corient initiated a JAMS arbitration against Lafferty in Miami, Florida.[39] Corient asserted claims for breach of non-competition and non-solicitation covenants, among other claims.[40] Corient also filed an emergency motion for a temporary restraining order, seeking to enjoin Lafferty's purported ongoing breaches.[41]

---

[35] MacAlpine Decl. ¶¶ 53-54; *see also id.* at Ex. 17.

[36] *Id.* ¶¶ 53, 56, 58.

[37] *Id.* ¶ 27.

[38] *Id.*

[39] Young Decl. Ex. 3 (JAMS arbitration demand).

[40] *Id.*

[41] Unsworn Decl. of Jeffrey S. Boxer in Supp. of Pet'r's Mot. for Expedited Proceedings and for TRO (Dkt. 16) ("Boxer Decl.") ¶ 2.

On December 31, 2025, an emergency arbitrator ordered Lafferty to respond to Corient's TRO motion by January 1, 2026 and scheduled a hearing for January 2, 2026.[42] Lafferty's counsel sought an adjournment, arguing that Lafferty "did not sign – and was not aware of – the purported Fifth [LLC Agreement]."[43]

The emergency hearing proceeded on January 2.[44] The narrow issue presented was whether Lafferty was bound by the Fifth LLC Agreement and its arbitration clause.[45] At the close of the hearing, the arbitrator held "there is ample evidence that [Lafferty] expressly adopted the Fifth [LLC Agreement] and the Arbitration Clause contained therein."[46] On January 5, the arbitrator entered a TRO against Lafferty.[47]

## G.     This Litigation

On January 2, 2026, Lafferty filed this lawsuit against Corient and Segall Bryant & Hamill.[48] He asserts that the Fourth LLC Agreement governs the parties'

---

[42] *Id.* ¶ 3.

[43] Young Decl. Ex. 1 (Order on Arbitrability Issue).

[44] *See id.*

[45] *See id.*

[46] *Id.*

[47] Resp'ts' Trial Br. (Dkt. 31) Ex. A.

[48] Dkt. 1.

dispute, as opposed to the Fifth LLC Agreement.[49]  To that end, Lafferty asks this court to enjoin the Florida arbitration under 10 *Del. C.* § 5703(b).[50]

Lafferty's complaint was accompanied by motions to expedite and for a TRO.[51]  After expedited briefing, I granted the motions to preserve the status quo and allow for prompt resolution of the issues.[52]  The parties agreed that an expedited trial was the most appropriate and efficient path forward; I agreed.[53]  Pre-trial briefs, relying on various affidavits, declarations, and exhibits, were filed.[54]  A trial on a paper record was held on February 4.[55]

## II.    LEGAL ANALYSIS

Lafferty asks this court to permanently enjoin the Miami arbitration pursuant to 10 *Del. C.* § 5703(b).  He asserts that his consent was required to amend the Fourth LLC Agreement's jurisdictional provision; that he did not consent to the amendment; and that the Fourth—not Fifth—LLC Agreement governs the dispute.

---

[49] Pet. ¶¶ 28-35.

[50] *Id.*

[51] Dkt. 1.

[52] Dkts. 25, 35.

[53] Dkt. 28.  The parties stipulated to an expedited briefing schedule.  *Id.*

[54] *See* Pet'r's Br. in Supp. of Pet. to Enjoin Arbitration (Dkt. 30) ("Pet'r's Trial Br."); Resp'ts' Trial Br.

[55] Dkt. 37.

10

The defendants respond that the Fifth LLC Agreement governs. They argue that Lafferty—like all Corient members—is bound by the agreement, and that the amendment was proper. As such, they believe that the arbitrator rather than this court has jurisdiction over the restrictive covenant dispute. Even if the amendment were invalid, though, they maintain that Lafferty assented to the amendment.[56]

My analysis proceeds in three parts. First, I determine that this court—not the arbitrator—has jurisdiction to resolve the issue of substantive arbitrability.[57] Next, I address whether the amendment complied with the terms of the Fourth LLC Agreement.[58] Finally, I confirm that Lafferty is bound by the Fifth LLC Agreement through his objective assent and acceptance of its benefits.[59]

## A.    Substantive Arbitrability

The threshold question before me is whether the parties' dispute is arbitrable.

The Fifth LLC Agreement contains a broad delegation clause. It states that the arbitrator "shall have [the] exclusive authority to resolve any dispute relating to

---

[56] Because the parties agreed to an expedited trial on a paper record before the defendants filed an answer, no affirmative defenses were formally pleaded. To the extent the defendants' arguments regarding Lafferty's conduct and acceptance of benefits constitute affirmative defenses, they were extensively briefed by both parties. Such issues were tried by the express or implied consent of the parties; Lafferty did not object. Accordingly, they are treated in all respects as if they had been raised in the pleadings. *See* Ct. Ch. R. 15(b).

[57] *See infra* notes 61-67 and accompanying text.

[58] *See infra* notes 68-73 and accompanying text.

[59] *See infra* notes 74-102 and accompanying text.

the interpretation, applicability, or enforceability of this agreement to arbitrate, including the arbitrability of any claims or defenses."[60] Relying on this provision— and the incorporated JAMS rules—the emergency arbitrator determined he had jurisdiction to resolve the operative dispute.[61]

Lafferty, however, challenges whether the Fifth LLC Agreement was validly formed as to him. He insists that he is bound only by the Fourth LLC Agreement, which lacks an arbitration provision and mandates that disputes be litigated in Delaware courts.[62]

Under Delaware law, questions of contract formation and existence are for the court to decide, not the arbitrator.[63] Even where a purported agreement contains a broad delegation clause, the court must first determine if the "contract in which it is contained" was validly formed.[64] The question becomes further complicated "when

---

[60] Fifth LLC Agreement § 14.02(b).

[61] Young Decl. Ex. 1 at 3-5.

[62] Pet'r's Trial Br. 20-21; *see* Fourth LLC Agreement § 13.19.

[63] *See SBV Interactive, Inc. v. Corp. Media P'rs*, 714 A.2d 758, 761 (Del. 1998) ("In a proceeding to stay or to compel arbitration, the question of whether the parties agreed to arbitrate, commonly referred to as 'substantive arbitrability[,]' is generally one for the courts and not for the arbitrators.").

[64] *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010) (holding that before a court enforces a delegation clause, it must first determine whether the underlying container agreement was validly formed).

the court is faced with multiple agreements" providing for different dispute resolution paths.[65]

Here, the dispute hinges on whether Lafferty assented to the Fifth LLC Agreement or whether the Fourth LLC Agreement remains operative. That is an issue of contract formation and interpretation—a matter reserved for the courts.[66] Thus, this court retains subject matter jurisdiction to determine which contract governs the parties' relationship.[67]

## B.     Whether the Amendment Is Valid

As a general matter, limited liability company members are bound by the terms of the company's operating agreement.[68] Here, the Fourth LLC Agreement required assent to amendments that disproportionately affected a member relative to the others. Section 10.01 prohibited unilateral amendments that "materially, adversely, and disproportionately affect any Member, or class of Members" without their consent.[69]

---

[65] *AffiniPay v. West*, 2021 WL 4262225, at *4-5 (Del. Ch. Sept. 17, 2021).

[66] *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide.").

[67] *See* Pet. ¶¶ 25, 28-35 (citing 10 *Del. C.* § 5703(b) as the basis for this court's jurisdiction).

[68] *See* 6 *Del. C.* § 18-101(9) (providing that a member is bound by an LLC agreement "whether or not the member or manager or assignee executes the limited liability company agreement"); *Seaport Vill. Ltd. v. Seaport Vill. Operating Co.*, 2014 WL 4782817, at *2 (Del. Ch. Sept. 24, 2014).

[69] Fourth LLC Agreement § 10.01(a). General principles of contract interpretation apply to a review of the Fourth and Fifth LLC Agreements. *See, e.g.*, *Osborn ex rel. Osborn v.*

13

Lafferty contends that the shift to mandatory arbitration is material and adverse because it eliminated his right to litigate in the courts of this state.[70] He also asserts that the change disproportionately affected individual members like him relative to the CI Member.[71] The defendants respond that the amendment did not disproportionately affect Lafferty because the arbitration provision applies uniformly to all members—including the CI Member.[72]

The defendants are correct that the amendment *applies* to all members equally. But Lafferty is focused on a perceived disproportionate *effect*. In his view, a private, confidential forum structurally advantages the majority member by shielding its conduct from public scrutiny and removing appeal rights.[73]

I need not resolve this novel interpretive question. Even assuming (without deciding) that the amendment creates a material, adverse, and disproportionate effect on individual members relative to the CI Member that required Lafferty's consent, the record demonstrates that he provided such consent nearly a year later.

---

*Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). As discussed in this section, I need not undertake an interpretive exercise.

[70] Pet'r's Trial Br. 24.

[71] *See* Trial Tr. 21 (Lafferty's counsel making this point).

[72] Resp'ts' Trial Br. 29-30.

[73] Pet'r's Trial Br. 24; *see* Trial Tr. 22-23.

## C. Assent in Writing and by Conduct

Lafferty is bound by the Fifth LLC Agreement for two reasons. First, he affirmatively assented to its terms in January 2025. Second, he accepted the agreement through his conduct.

### 1. The Equity Award Agreement

On January 15, 2025, Lafferty electronically executed an Equity Award Agreement.[74] He acknowledged that his award of Class A membership units was "subject to all of the terms and conditions set forth in the applicable documents available for download in connection with th[e] Equity Award . . . all of which [were] incorporated herein in their entirety."[75] He also checked a box affirming that he "read and underst[oo]d" the Notice of Conversion, which was hyperlinked.[76] The Notice of Conversion, in turn, stated that his units would be "eligible for distributions . . . in accordance with the terms of the Fifth [LLC Agreement]."[77]

This conduct constitutes affirmative assent.[78] A sophisticated party like Lafferty is bound by the terms of documents incorporated by reference in the

---

[74] Nuñez Decl. Ex. 5.

[75] *Id.*; *see supra* Section I.D.

[76] Nuñez Decl. Ex. 5.

[77] *Id.* at Ex. 6.

[78] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008) ("A contract is valid if it manifests mutual assent by the parties and they have exchanged adequate consideration.").

15

contract he signs.[79]  The Equity Award Agreement incorporated the Notice of Conversion, which clearly stated that Lafferty's units were subject to the terms of the Fifth LLC Agreement.[80]  By executing the Equity Award Agreement and confirming his receipt and understanding of the Notice of Conversion, Lafferty objectively manifested his assent to the Fifth LLC Agreement.[81]

Lafferty asserts that this chain of incorporation—from the Equity Award Agreement, to the Notice of Conversion, to the Fifth LLC Agreement—is too attenuated to show a clear intent to waive his litigation rights.[82]  This court has

---

[79] *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *6-8 (Del. Ch. Mar. 27, 2014) (holding that a contracting party assented to the terms of a restrictive covenant by accepting an award subject to the terms "explicitly referenced" and expressly acknowledged, even if the party did not read those terms); *RHA Constr., Inc. v. Scott Eng'g, Inc.*, 2013 WL 3884937, at *7 (Del. Super. July 24, 2013) ("The obligation of a contracting party to read any contract it signs extends to documents incorporated by reference, which become part of the terms of the parties' agreement at the time of execution." (citation omitted)); *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818-19 (Del. 2018) ("Other documents or agreements can be incorporated by reference 'where a contract . . . refers to another instrument and makes the conditions of such other instrument a part of it.' When that occurs, 'the two will be interpreted together as the agreement of the parties.'" (citations omitted)).

[80] Nuñez Decl. Ex. 6.  The Notice of Conversion took the form of a three sentence-long email.  The last sentence discusses the Fifth LLC Agreement.  *Id.*

[81] *See REM OA Hldgs., LLC v. N. Gold Hldgs., LLC*, 2023 WL 6143042, at *21-22 (Del. Ch. Sept. 20, 2023) (holding that a party's signature bound him to all documents incorporated by reference, even if nested), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE); *see also McAnulla Elect. Const., Inc. v. Radius Techs., LLC*, 2010 WL 3792129, at *4 (Del. Super. Sept. 24, 2010) ("The obligation of a contracting party to read any contract it signs extends to documents incorporated by reference, which become part of the terms of the parties' agreement at the time of execution.").

[82] Pet'r's Trial Br. 29-31; Trial Tr. 26.

16

previously rejected similar attempts to evade obligations contained in nested incorporated documents.[83] As this court noted in *REM OA Holdings v. Northern Gold Holdings*, a contracting party "b[ears] responsibility for making further inquiries before it agreed to assume obligations defined in a separate document."[84]

Further, Delaware courts do not impose a higher standard for incorporating arbitration clauses compared to other contractual terms.[85] A signature on an instrument incorporating a governing agreement binds the signatory to the entire agreement, not just the favorable parts.[86] Because Lafferty is bound by the economic terms of the Fifth LLC Agreement—an upside he accepted—he is equally bound by the dispute resolution provision.[87]

---

[83] *REM OA*, 2023 WL 6143042, at *21 (holding a sophisticated party was bound by a warrant provision contained in a commitment letter that was, in turn, incorporated by reference into a written consent the party executed).

[84] *Id.*

[85] *Mikkilineni v. PayPal, Inc.*, 2021 WL 2763903, at *12 (Del. Super. July 1, 2021) ("[A]rbitration clauses are governed by [the] principles of contract formation."); *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *9 (Del. Ch. Mar. 30, 2020) ("In considering [an] agreement to arbitrate, general state law contract principles, and not any special rules separate to arbitration agreements, must apply."), *aff'd*, 243 A.3d 441 (Del. 2020) (TABLE).

[86] *See Est. of Carmel v. GIII Accumulation Tr.*, 2023 WL 313931, at *5 (D. Del. Jan. 19, 2023) ("A party to a contract cannot silently accept its benefits and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance." (citation omitted)).

[87] *See infra* note 96 (citing case law).

Lafferty was free to read the Fifth LLC Agreement before agreeing to the Notice of Conversion. He opted not to. Nevertheless, he voluntarily bound himself to a document explicitly referencing it. "[H]e alone is responsible for his omission."[88] Akins's February 2024 email describing the Fifth LLC Agreement as lacking changes that "materially, adversely, and disproportionately affect any partner or the individual partners" cannot excuse Lafferty's failure to read it.[89]

### 2. Acceptance by Conduct

Regardless of the effect of the Equity Award Agreement, Lafferty's acceptance of the Fifth LLC Agreement's benefits provides an independent basis to find that he assented to its terms. By executing the Equity Award Agreement, Lafferty accepted the conversion of his Class B units to Class A units, a grant of additional units, and the receipt of quarterly distributions through 2025.[90] Under

---

[88] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. . . . A contract[ing party] must stand by the words of his contract[.]" (citation omitted)); *see also W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 3247992, at *4 n. 19 (Del. Ch. Oct. 6, 2009) ("[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract." (citing 27 *Williston on Contracts* § 70.113 (4th ed. 2009))), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE); *REM OA Hldgs.*, 2023 WL 6143042, at *22 (same).

[89] Nuñez Decl. Ex. 1; *see supra* notes 18-21; *see also infra* Section II.C.3.

[90] *See supra* notes 25-26 and accompanying text.

Delaware law, "[a] party to a contract cannot silently accept its benefits and then object to its perceived disadvantages."[91]

Lafferty attempts to minimize this conduct by noting he did not receive any "significant" new benefits under the Fifth LLC Agreement that he was not already entitled to receive under the prior version.[92] The record shows otherwise. The Notice of Conversion transformed Lafferty's Class B profit interests into Class A capital interests with downside protection—a meaningfully different, and valuable, structural change.[93] He also accepted a grant of 238 new units issued under the Fifth LLC Agreement.[94] His acceptance of such benefits for almost a year—totaling over $7 million in value[95]—constitutes an objective manifestation of his assent to the Fifth LLC Agreement's terms, including the arbitration provision. Having enjoyed the benefit of his bargain, Lafferty cannot now shirk the accompanying dispute resolution mechanism.[96]

---

[91] *Graham v. State Farm Mut. Auto. Ins.*, 565 A.2d 908, 913 (Del. 1989).

[92] Pet'r's Trial Br. 10-11; *see* Trial Tr. 24.

[93] *See* MacAlpine Decl. ¶ 27; *see also* Trial Tr. 36.

[94] Nuñez Decl. Ex. 7.

[95] MacAlpine Decl. ¶ 27.

[96] *Graham*, 565 A.2d at 913 (providing that a party's acceptance of auto insurance coverage under an auto insurance policy bound them to the policy's arbitration clause); *cf. E. States Petroleum Co. v. Universal Oil Prods. Co.*, 49 A.2d 612, 616 (Del. Ch. 1946) ("Even a defrauded complainant cannot accept the benefits received under a contract on the one hand and shirk its disadvantages on the other."); *Elia v. Hertrich Fam. of Auto. Dealerships, Inc.*, 103 A.3d 514, 2014 WL 5410723, at *1 (Del. Oct. 23, 2014) (TABLE) (enforcing an

19

### 3. The February 2024 Email

Lafferty submits that he is not bound by the Fifth LLC Agreement—under either theory of assent—because he was misled by Akins's February 2024 email, which stated that "no material changes" were made to the Fourth LLC Agreement.[97] Notably, he has not pleaded fraud or negligent misrepresentation to invalidate his assent. Instead, because he allegedly relied on this email, he believes that he had no obligation to read the Fifth LLC Agreement before accepting the units or conversion.

This argument is unpersuasive. At a minimum, Akins's email gave Lafferty constructive notice that the agreement had been amended.[98] He knew that changes were made to the Fourth LLC Agreement, and he was invited to review the Fifth Amended LLC Agreement and ask questions.[99] Unlike *UBEO Holdings, LLC v. Drakulic*, which Lafferty relies on, he was not "kept in the dark."[100] Rather, one

arbitration clause because the facts showed the parties proceeded under the agreement and "continue[d] to enjoy the benefit of their bargain").

[97] *See supra* notes 18-21 and accompanying text (describing Akins's February 28 email).

[98] *Deutsche Bank Nat'l Tr. Co. v. Goldfeder*, 86 A.3d 1118, 2014 WL 644442, at *2 (Del. Feb. 14, 2014) (TABLE) (defining "[c]onstructive knowledge" as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person" (citing *Knowledge*, Black's Law Dictionary 950 (9th ed. 2009))).

[99] Nuñez Decl. Ex. 1.

[100] 2021 WL 1716966, at *1 (Del. Ch. Apr. 30, 2021) (refusing to enforce an arbitration clause where the party "was intentionally kept in the dark of the contents of the agreement").

week after Akins's email alerting him to the amendment, Lafferty was given access to the Fifth LLC Agreement on Carta.[101]

The timing of Lafferty's assent to the Notice of Conversion and acceptance of the Class A membership units further undercuts his argument. He executed the Equity Award Agreement eleven months after Akins's email was sent. He cannot rely on an email summary in February 2024 to excuse his failure to read a contract in January 2025.[102]

## III. CONCLUSION

Lafferty's request to enjoin the Miami arbitration fails. He is bound by the Fifth LLC Agreement, including its arbitration provision. Judgment is entered for the defendants. Within three business days, parties must confer on and file a proposed final order to implement this decision.

---

[101] Nuñez Decl. Exs. 2-4.

[102] *See, e.g.*, *W. Willow-Bay*, 2009 WL 3247992, at *4 n.19 ("[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract." (citation omitted)).